United States District Court

For the Northern District of California

1

2

3

4

5            IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8

9   ROBERT GREEN FAIRBANK,               DEATH PENALTY CASE

10                    Petitioner,        NO. C 98-1027 CRB

11          v.                           ORDER GRANTING RESPONDENT'S
                                         MOTION FOR SUMMARY
12   ROBERT L. AYERS, JR., Warden,       JUDGMENT
     California State Prison at San Quentin,  (Docket No. 129)

13                    Respondent.

14

15

16          This habeas petition arises from Robert Green Fairbank's guilty plea and sentence to

17   death for the 1985 murder of Wendy Cheek in San Francisco, California.  Now pending for

18   decision is Respondent's Motion for Summary Judgment on all of the Petition's claims.  The

19   Court conducted oral argument on the following claims: (1) Claim 1 subclaim that defense

20   counsel were constitutionally ineffective by presenting allegedly erroneous expert testimony

21   that Petitioner had an antisocial personality disorder and that Petitioner had no mental illness

22   or neurological damage; and (2) Claim 12, prosecutorial misconduct by eliciting testimony

23   about a racial slur.  For the reasons discussed below, Respondent's Motion is granted.

24                          **FACTUAL BACKGROUND**

25          The following recitation of facts is based primarily on the Supreme Court of

26   California's opinion disposing of Petitioner's direct appeal, People v. Fairbank, 16 Cal. 4th

27   1223 (1997), as modified on denial of reh'g (Feb. 18, 1998).  The state court's factual

28   determinations are presumed to be correct pursuant to 28 U.S.C. § 2254(e)(1), and are

1    confirmed by the Court's own independent review of the record.  See Earp v. Ornoski, 431

2    F.3d 1158, 1165 n.3 (9th Cir. 2005).

3        The information filed April 25, 1986 charged Petitioner with first degree murder and

4    alleged that he committed the murder while attempting to commit rape and unlawful oral

5    copulation.  The information further alleged infliction of torture and use of a deadly weapon

6    and that Petitioner had two prior felony convictions, which Petitioner admitted before trial.

7    **I.    Guilt Phase**

8        Testimony in the trial's guilt phase began on the afternoon of March 21, 1989.  John

9    Adkins, a friend of Wendy Cheek, testified that on the morning of December 12, 1985,

10   Cheek told him that she planned to attend a party at his apartment that evening.  Adkins lived

11   on Ashbury Street in San Francisco, not far from where Cheek lived.  Adkins did not attend

12   the party himself, but was told that Cheek did not appear at the party.  One week later Adkins

13   received a phone call from Cheek's mother, who was worried because the family had not

14   heard from her.  Adkins searched for Cheek and found her car parked near his house on the

15   900 block of Clayton Street.

16       A witness testified that on December 14, 1985, he found a body in a grove of trees

17   near highway 280 in San Mateo County.  The responding highway patrolman testified that

18   the body was naked, had numerous stab wounds, and was partially burned.  An assistant

19   coroner testified that fingerprints identified the body as Cheek.  Officer Dirickson, a police

20   detective who investigated the scene, testified that automobile parts had been placed over the

21   body in an apparent attempt at concealment.  A forensic criminalist testified that he collected

22   plant samples from the scene to test for accelerants and detected the presence of gasoline.

23       After the prosecution presented the above evidence Petitioner pleaded guilty to first

24   degree murder and admitted the special circumstances of attempted oral copulation and

25   torture, and the special allegation of personally using a deadly or dangerous weapon.

26   Petitioner did not admit the attempted rape special circumstance, which the court dismissed

27   at the prosecution's request.

28   **II.   Penalty Phase**

**United States District Court**

For the Northern District of California

**A.     Prosecution Evidence**

The penalty phase of Petitioner's trial began on April 4, 1989.  The pathologist who conducted the autopsy on Cheek's body testified that Cheek had been burned extensively with gasoline but had died before being set on fire.  A number of blunt injuries on Cheek's head and torso were consistent with blows from a fist.  Multiple puncture wounds on the back of her head and neck appeared to be from a Phillips screwdriver.  Other puncture wounds were consistent with stabbing by a barbeque fork.  Stab wounds in her neck and upper back appeared to be from a knife.  Two stab wounds, four and one-half to five inches deep, pierced Cheek's right lung and aorta, causing massive bleeding and death within a few minutes.  Cheek had blood under her fingernails, suggesting she had scratched someone shortly before she died.  A criminalist testified that he tested the fingernail scrapings and determined that the blood was the same ABO blood type as Petitioner's and Cheek's, but could not further narrow down the source.

Phyllis Marie Kitchell Fairbank (Kitchell) lived with Petitioner at 953 Clayton Street, close to where Cheek's car was located at 977 Clayton Street.  Kitchell testified that Petitioner often abused her physically, causing her to seek medical treatment.  Kitchell was hospitalized in early December 1985.  On the evening of December 12, the day Cheek disappeared, Petitioner visited Kitchell in the hospital; Petitioner was upset and had fresh scratches on his face and reported that two other people had involved him in a murder.  The murder had taken place "up in the hills, in woods," but he did not admit personal involvement in the killing.  The next day, Petitioner picked Kitchell up at the hospital. Petitioner drove Kitchell's car, to which he had access while she was hospitalized.  After meeting Kitchell, Petitioner retrieved laundry from a laundromat, including bedding that he and Kitchell normally cleaned at home.  When Kitchell arrived home, she discovered that a steamer trunk was missing.  A car wash owner later found a bloodstained steamer trunk, matching the missing one, abandoned at a San Francisco car wash.  The criminalist who examined the blood found in the steamer trunk testified that it was consistent with Cheek's blood type.

On the evening of December 14, 1985, Petitioner physically abused Kitchell, punching and kicking her repeatedly.  Kitchell called the police, claiming to have overdosed, and was taken to the hospital by ambulance.  A responding police officer testified that Petitioner had scratches on his face and neck.  Petitioner blamed Kitchell for the scratches, but the officer noticed that they were not freshly made because they were not bleeding and were starting to scab.  The next day, Kitchell told a therapist at the hospital that she was not suicidal and had not overdosed.  She called the police from the hospital and explained what had happened the previous night.  Petitioner was arrested, and Kitchell returned home to the apartment.  Within a couple of days, Kitchell noticed that a rug from the front room had been moved to the bedroom.  When Kitchell moved the rug, she noticed that it covered a large hole in the carpet.  Sometime later Kitchell also noticed that screwdrivers were missing from her dresser drawer and that her red bodysuit had blood on the front and was stretched.

Kitchell's sister, Toni Stracener, testified that she stayed for a few months at Petitioner's and Kitchell's apartment after Kitchell returned home from the hospital in December 1985.  On December 16, Petitioner called Stracener and told her part of the carpet was missing because the cats had soiled it; he asked Stracener to replace the missing carpet, and she told him that she would do so.

Detective Mike Dirickson testified that he visited Petitioner's apartment at 953 Clayton Street on December 27, 1985.  Kitchell was speaking with Petitioner on the telephone when Dirickson arrived.  Petitioner advised Kitchell not to allow the police into the apartment, but she had already done so.  Petitioner also directed Kitchell to get rid of his jeans, which she instead gave to the police along with her blood-stained bodysuit.  While Dirickson was at the apartment, Petitioner also spoke with Stracener by telephone.  Stracener told Petitioner that the police were there, and he asked her if she had replaced the missing carpet in the bedroom.  Kitchell showed the police the torn carpet hidden under a throw rug in the bedroom.  Dirickson observed blood along the edges of the carpet and blood spatters on the bed frame.  Dirickson also examined Kitchell's car and found a flashlight with blood smeared on the handle and a Phillips screwdriver.

United States District Court

For the Northern District of California

Dirickson returned to the apartment the next day with a criminalist from the county forensic laboratory.  The criminalist found blood on a wall above the bed, on a table adjacent to the bed, in the living room, and on the back door.  He also discovered a large amount of blood on the underside of the mattress, which appeared to have been flipped over.  Genetic marker testing indicated that the blood on the carpet and mattress matched Cheek's blood.  The criminalist opined that only one in 66,000 people had the markers detected by the nine testing systems he used with results, and he was able to eliminate Petitioner and Kitchell as the source.  He also detected blood in the hatchback of Kitchell's car, and testified that ABO testing determined that the Type A blood there matched Cheek's blood type.  Finally, the criminalist examined the blood on Kitchell's red bodysuit; it was consistent with Cheek's, but not Kitchell's, blood type.

The criminalist returned to the apartment on January 2, 1986, and conducted luminol testing to detect blood that was not otherwise visible.  The testing revealed footprints leading from the bedroom to other parts of the apartment.  After comparing the footprints to sample footprints he had taken from Petitioner, the criminalist could not exclude Petitioner as the source and testified that every measurement of the footprints matched Petitioner's footprints.

The criminalist also tested a skirt and sweater that were found in May or June 1986 off interstate highway 280, a number of miles north of where Cheek's body was discovered in December 1985.  He compared the clothing to a button and clothing label that were found in the area where the body was located, and opined that those items found near Cheek's body were once part of the skirt, based on an examination of the threads and on a matching jacket that Cheek's mother provided to the laboratory.  The criminalist tested the clothing for blood, but was not able to obtain a sufficient sample.

John Szymkiewicz testified that he became acquainted with Petitioner while occupying a jail cell near Petitioner's in the spring of 1986.  Szymkiewicz was facing robbery, assault, and false imprisonment charges, and he admitted that he had cooperated with police in return for a reduction of his own sentence from 22 or more years to 10 years. While in jail, Petitioner approached Szymkiewicz about having "a girl named Phyllis" hurt

1  "because she was a snitch testifying against him."  Petitioner spoke to Szymkiewicz and also

2  passed him notes.  One note read:

> I want Phyllis & her snitch ass sister beat on some & scared to living hell, then
> smash in 25" color TV, smash computer, & anything else of value!!!  I want the
> car totalled!  I imagine the car can be done first or whatever these dudes
> decide.  One of <u>many</u> reasons I want it done is to keep them from testifying
> against me next week!!"

6   In another note, Petitioner indicated he wanted Kitchell's leg or arms broken and wrote, "<u>I</u>

7  <u>for sure</u> want this done & <u>NO</u> I won't change my mind!!"  According to Szymkiewicz, he

8  and Petitioner discussed payment.  Kitchell testified that Petitioner called and threatened her

9  before and after his preliminary hearing, telling her that "other people" would break her arms

10  and legs if she testified against him.  Stracener also testified that Petitioner called and

11  threatened her about a month after she testified at a preliminary hearing.

12          Arlene Gemmil, who lived near Petitioner's apartment, testified that on December 5,

13  1985, a week before Cheek's disappearance, she parked on the 900 block of Clayton Street

14  and stopped to pet a cat as she walked home.  Petitioner invited her to look at the cat's

15  kittens.  Once she was in the bedroom of his apartment, he admitted that he did not have

16  kittens.  As Gemmil attempted to leave, Petitioner asked her if she wanted to make money

17  modeling lingerie.  Gemmil was still trying to leave the apartment, getting within inches of

18  the front door, when Petitioner grabbed her from behind and hit her on the left side of her

19  face.  Petitioner hit her in the sternum, knocking the wind out of her, before forcing her to

20  orally copulate him.  She tried to escape by winning his trust, but did not succeed.  Petitioner

21  forced her to orally copulate him several more times.  He also penetrated her vagina and anus

22  with his finger and asked her to remove her clothing and put on a red bodysuit.  Forcing

23  Gemmil to hold his arm, Petitioner used a hypodermic needle to push an empty syringe into

24  his arm, drawing out brownish liquid and injecting it back into his arm.  He continually asked

25  Gemmil if she wanted cocaine, though she did not see any drugs there.  He made numerous

26  telephone calls, apparently in an attempt to purchase drugs, and to listen to pornographic

27  recordings, which he also made Gemmil hear.  She testified that during the approximately

28

United States District Court

For the Northern District of California

two hours she was in Petitioner's apartment, he appeared to be in control of the situation and was not hitting or injuring himself.

Petitioner subsequently apologized to Gemmil for hitting her and said he wanted to take her out to dinner. Petitioner permitted her to put her clothes back on, and they left the apartment together. When someone in a car passed close enough to hear Gemmil scream, she walked away from Petitioner, who did not follow. Gemmil went home and was taken to a hospital. She testified that she had not scratched Petitioner.

Dr. Deborah Heath, who had frequent contact with drug users, testified that drug users who want drugs sometimes insert a previously used hypodermic needle into a vein, draw out blood, and then inject the blood back into the vein. Reusing needles had a placebo effect because the psychological association of putting the needle back into their vein would stimulate the prior association with injecting drugs. Dr. Heath also testified that some drug users believe the residue in the used syringe and needle will be enough to make them high.

Jennifer Roth testified that in October 1979 she lived with Petitioner on Irving Street in San Francisco. When Petitioner suspected her of having a relationship with another man, Petitioner tore up the bedroom, hit Roth, put a bullet in a pistol, spun the cartridge, put the barrel of the pistol to Roth's head, and pulled the trigger. Roth called the police; Petitioner was arrested and imprisoned at the California Rehabilitation Center.

The prosecution also presented evidence indicating that on December 5, 1985, the day of the Gemmil sexual assault, and again on December 12, the day Cheek disappeared, a series of telephone calls were made from Petitioner's apartment to a telephone number that connected to a pornographic recording. Detective Dirickson examined telephone records and testified that four calls were made on December 5, and seven calls were made on December 12, to the same 976 telephone number.

The prosecution also presented documentary evidence of prior convictions for second degree burglary, receiving stolen property, battery with serious bodily injury, and felon in possession of a weapon.

United States District Court

For the Northern District of California

1

**B.    Defense Evidence**

On cross-examination Kitchell testified that she met Petitioner when he was in the hospital receiving psychiatric treatment, spending a "wonderful" Christmas together.  They both liked camping, walking, going to the beach, and going to movies.  They discussed having a family, owning a home, and possibly starting a business.  Kitchell also described how cocaine use affected Petitioner's personality, causing paranoia, self-mutilation and explosive outbursts of rage.

The defense elicited testimony from Roth on cross-examination that around the time Petitioner assaulted her with a pistol, his personality changed because of heavier drug use: he lost weight, had marks on his arms, became angry and paranoid, and abused himself.  Roth noticed a positive change in Petitioner after he was treated for drug use, returning to the "original self" whom she knew, but after his release, he used cocaine and returned to his abusive ways.  Roth also testified that Petitioner rarely worked, that his mother helped support him, and that "he knew that he could get whatever he wanted from her."  Roth knew Petitioner's mother in 1979 and saw signs that she was an alcoholic.  Petitioner's mother died while he was imprisoned, after which he received money from a trust fund that she established for his benefit.

Dr. H. Westley Clark testified about the effects of Petitioner's longtime substance abuse.  Dr. Clark reviewed Petitioner's medical and hospital records from 1981 to 1985, and testified that the primary reasons for Petitioner's hospitalizations were cocaine dependency, alcohol abuse and marijuana abuse.  He also testified that Petitioner's efforts to obtain prescriptions for various tranquilizers on December 3, 4 and 11, 1985, reportedly to treat pain caused by an auto accident for which Kitchell was being hospitalized, were consistent with the effects of cocaine dependency.  Dr. Clark concluded that Petitioner's "chemical dependency was quite severe."

The defense also presented evidence relating to Petitioner's childhood.  Petitioner was born in 1952.  His father, Robert Fairbank, Sr., testified that Petitioner grew up in a "very nice" neighborhood of a small resort community on the Connecticut coast.  The family

United States District Court

For the Northern District of California

1  moved in with Petitioner's maternal grandfather. Mr. Fairbank testified that his father-in-

2  law's financial support and interference in household affairs caused constant tension in his

3  marriage. Mr. Fairbank acknowledged that he and Petitioner's mother drank often, and he

4  characterized her as a heavy drinker. During one argument, after they had both been

5  drinking, Petitioner's mother spit in Mr. Fairbank's face. He then hit her, and she fell

6  through a glass door when she tried to retaliate. Mr. Fairbank denied hitting Petitioner, but

7  other witnesses who knew the family testified that he often hit Petitioner, who was afraid of

8  his father. As Petitioner grew older, he had a few minor brushes with the law, and two

9  private schools expelled him. According to Mr. Fairbank, Petitioner's mother and maternal

10  grandfather spoiled him with presents whenever he did something wrong. On one occasion,

11  his mother bought him a boat after police arrested him. In 1968, when Petitioner was 16

12  years old, he had a fight with his father, breaking his father's rib. Petitioner's parents were

13  divorced a short time later. After spending some time in reform school, Petitioner moved to

14  California with his mother at about age 18.

15      The defense called several witnesses who knew Petitioner and his family when he was

16  growing up. Though he was raised in an affluent community, one witness described

17  Petitioner's upbringing as "dreadful," and another witness described it as "perfectly awful."

18  Friends of Petitioner's mother described his father as a "nasty, sarcastic, abusive," and

19  "frustrated, mean-spirited" person who verbally abused Petitioner's mother. His father also

20  yelled at and humiliated Petitioner, who feared his father, and his mother was passive, doing

21  nothing to intervene. One childhood friend described an occasion when Petitioner's father

22  struck Petitioner in the face without provocation. This type of abuse was "common

23  knowledge" in the community. Each of these witnesses expressed that he or she thought it

24  was important for the jury to understand how Petitioner was treated as a child.

25      Petitioner enjoyed performing dangerous stunts and had a reputation in the community

26  as a "bad boy." He stole money from a neighbor's house, and he and a friend frequently

27  broke into summer houses. He repeatedly beat up this friend to show off to other friends.

28  Despite this misbehavior, Petitioner's mother would make excuses for him and spoil him

United States District Court

For the Northern District of California

1  with "all sorts of material things."  His grandfather would also spoil him and bail him out of

2  trouble.

3       Dr. Alfred Fricke, a clinical psychologist, performed research on Petitioner and his

4  background and testified about Petitioner's psychological makeup.  Having interviewed

5  about a dozen people in Connecticut and reviewed police reports, trial testimony transcripts

6  and medical records, Dr. Fricke described Petitioner as a hyperactive child, "a difficult kid

7  . . . born into . . . a family ca[u]ldron."  He grew up with an "abusive, angry dad" who at

8  some point "gave up on him, and the kid could do no right."  Dr. Fricke opined that

9  Petitioner's father had low self-esteem and felt emasculated because he could not provide for

10  his family independently.  He had high expectations for his son.  Dr. Fricke considered it

11  significant that, while Petitioner's father abused him, his mother spoiled him but did nothing

12  to stop his father's abuse.  This type of background "sets up the pattern for a man to later on

13  develop the kind of [abusive] relationships that he has as an adult."  Dr. Fricke concluded

14  that the conflicting signals from his parents prevented Petitioner from developing a

15  conscience.

16       Dr. Fricke also administered six psychological tests on Petitioner, and referred him to

17  a neuropsychological specialist for further tests.  The tests did not reveal that Petitioner

18  suffered from any psychosis or mental illness, and on one test Dr. Fricke observed that

19  Petitioner was faking his answers to appear more disturbed.  State Rec. 29 (Reporter's

20  Transcript on Appeal) at 3521.  Dr. Fricke concluded that Petitioner had an antisocial

21  personality disorder and suffered from drug addiction.  He testified that in comparison to a

22  mental disorder of psychosis, cocaine psychosis is short-lived, triggered by effects of the

23  drug, when a person is out of touch with reality.  State Rec. 29 at 3526.  While Petitioner's

24  drug addiction exacerbated his antisocial behavior, Dr. Fricke testified that Petitioner would

25  still suffer from the antisocial personality disorder without the drugs, just "not as bad."  The

26  drugs made Petitioner unpredictable, irrational and paranoid.  Nevertheless, according to Dr.

27  Fricke, he is "fully responsible for his behavior and his life."  Petitioner is capable of

28  realizing that his various acts of theft, assault, and murder are wrong; he simply does not care

1    about the consequences of his actions.  Dr. Fricke suggested that Petitioner would respond

2    well to the structured environment of prison.  On cross-examination Dr. Fricke testified that

3    Petitioner did not remain for long in the drug programs in which he was enrolled at various

4    hospitals after release from prison.

5        **C.    Closing Argument**

6        The prosecutor's primary argument was that the gruesome circumstances of the crime

7    warranted the imposition of death.  He recounted those circumstances for the jury in chilling

8    detail.  He also emphasized that according to Petitioner's own experts, Petitioner does not

9    suffer from a mental illness or defect and argued that drug use does not explain the crimes.

10   Defense counsel began his argument by explaining that he would not argue that

11   Petitioner had ever done anything to his credit; nor would he ask the jury to show mercy.  He

12   would not present any excuses for Petitioner's crimes and would not present a legal defense

13   based on drug use or mental state.  Instead, he would argue that the death penalty is simply

14   not necessary to protect society from Petitioner.

15   First, relying on Dr. Fricke's testimony, counsel argued that the death penalty is not

16   necessary because as a sociopath Petitioner is controllable.  Because Petitioner has a

17   psychological disorder rather than a mental illness, he can be controlled provided he is in a

18   structured environment, such as prison.  Counsel emphasized that Petitioner had never

19   committed a violent crime while in prison and thus life in prison rather than the death penalty

20   is all that is needed to protect society.

21   Second, counsel urged the jury to consider Petitioner's dysfunctional family

22   background as an extenuating circumstance.  He cautioned that he was not offering

23   Petitioner's family background as an excuse, but rather as an explanation for how he

24   developed his personality disorder.

25   Finally, counsel argued that Petitioner's worst crimes were committed when he was on

26   drugs.  Counsel again cautioned that he was not arguing that the drugs constitute a legal

27   excuse for the crime; instead, he urged that the public will be safe if Petitioner is sentenced to

28   life in prison because he will not have access to drugs and therefore will not be a danger.

United States District Court
For the Northern District of California

1

**D.     The Verdict**

The jury deliberated for less than two hours before returning a verdict of death.

Petitioner filed a motion to reduce the penalty to life imprisonment without possibility of

parole, which the trial court denied, sentencing Petitioner to death.  Petitioner subsequently

filed a motion to withdraw his guilty plea, on which the trial court held an evidentiary

hearing on June 27 and June 29, 1989.  The trial court heard argument and denied the motion

to withdraw the plea.

**PROCEDURAL HISTORY**

The California Supreme Court affirmed the convictions and sentencing on December

22, 1997.  People v. Fairbank, 16 Cal. 4th 1223 (1997), as modified on denial of reh'g (Feb.

18, 1998).  The United States Supreme Court denied certiorari on October 5, 1998.  Fairbank

v. California, 525 U.S. 861 (1998).

Petitioner filed his first state habeas petition on September 14, 2000.  The California

Supreme Court denied this petition on November 12, 2003.  State Rec. 46 (In re Fairbank,

Cal. Supr. Ct. No. S091530).

Also on September 14, 2000, Petitioner filed a habeas petition with this Court.

Petitioner subsequently filed an amended petition containing newly exhausted claims, with

an effective filing date of November 12, 2003.  Respondent filed a motion to dismiss

procedurally defaulted claims and claims precluded by Petitioner's guilty plea.  On March

22, 2005, the Court denied the motion to dismiss.  Now pending is Respondent's motion for

summary judgment on all claims.

**STANDARD OF REVIEW**

**I.     Federal Habeas Review**

The Petition must be decided in the context of the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA").  Under AEDPA, the Court cannot grant a writ of habeas

corpus with respect to any claim that was adjudicated on the merits in state court unless the

state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

The "contrary to" and "unreasonable application" clauses of § 2254(d) have separate and distinct meanings. See Williams v Taylor, 529 U.S. 362, 404 (2000). A state court's decision is "contrary to" clearly established federal law if it fails to apply the correct controlling authority or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. Id. at 413-414. A decision is an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id. at 414.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a great[] degree of deference to the state courts . . . ." Clark v. Murphy, 331 F.3d 1062, 1068 (9th Cir. 2003).

Holdings of the Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under AEDPA. See Williams, 529 U.S. at 412. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. See Clark, 331 F.3d at 1070.

When a federal court is presented with a state court decision that is unaccompanied by a rationale for its conclusions, the court has no basis other than the record "for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). In such

United States District Court

For the Northern District of California

1  situations, federal courts must conduct an independent review of the record to determine

2  whether the state court decision is objectively unreasonable.  Id.  While federal courts "'are

3  not required to defer to a state court's decision when that court gives [them] nothing to defer

4  to, [they] must still focus primarily on Supreme Court cases in deciding whether the state

5  court's resolution of the case constituted an unreasonable application of clearly established

6  federal law.'"  Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002) (quoting Fisher v.

7  Roe, 263 F.3d 906, 914 (9th Cir. 2001)).  Furthermore, independent review of the record is

8  not de novo review of the constitutional issue, but rather, the only way a federal court can

9  determine whether a silent state court decision is objectively unreasonable.  Himes v.

10 Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  However, if the state court did not reach the

11 merits of a claim, federal review of the claim is de novo.  Nulph v. Cook, 333 F.3d 1052,

12 1057 (9th Cir. 2003).

13       Even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted

14 only if the constitutional error at issue had a substantial and injurious effect or influence in

15 determining the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  Under this

16 standard, petitioners "may obtain plenary review of their constitutional claims, but they are

17 not entitled to habeas relief based on trial error unless they can establish that it resulted in

18 'actual prejudice.'"  Id. at 637 (citing United States v. Lane, 474 U.S. 438, 439 (1986)).

19 **II.    Evidentiary Hearing**

20       Under AEDPA, a district court presented with a request for an evidentiary hearing

21 must determine whether a factual basis exists in the record to support the petitioner's claim.

22 If it does not, and an evidentiary hearing might be appropriate, the court's first task in

23 determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has

24 "failed to develop the factual basis of a claim in State court."  Baja v. Ducharme, 187 F.3d

25 1075, 1077 (9th Cir. 1999).  If so, the district court may not hold an evidentiary hearing

26 unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional

27 law that the Supreme Court has made retroactive to cases on collateral review, or (b) a

28 factual predicate that could not have been previously discovered through the exercise of due

United States District Court

For the Northern District of California

1  diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and

2  convincing evidence that but for constitutional error, no reasonable fact finder would have

3  found the applicant guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).  Under

4  AEDPA, "a failure to develop the factual basis of a claim is not established unless there is a

5  lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."

6  Williams (Michael) v. Taylor, 529 U.S. 420, 432 (2000).

7       If, on the other hand, a petitioner has not failed to develop the factual basis for his

8  claims in the state court, he is entitled to a federal evidentiary hearing if the facts are in

9  dispute, and (1) the petitioner's allegations, if proven, would establish the right to relief, and

10  (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant

11  facts.  See Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005) (citing Townsend v.

12  Sain, 372 U.S. 293, 313 (1963)); Williams (Keith) v. Calderon, 52 F.3d 1465, 1484 (9th Cir.

13  1995); Jeffries v. Blodgett, 5 F.3d 1180, 1187 (9th Cir. 1993). Under these circumstances, a

14  petition may be dismissed without a hearing only when it consists solely of conclusory,

15  unsworn statements unsupported by any proof or offer thereof.  Phillips v. Woodford, 267

16  F.3d 966, 973 (9th Cir. 2001).  Circumstances under which an evidentiary hearing is not

17  required include: (1) where the petitioner fails to make out a colorable claim for relief, see

18  Rich v. Calderon, 170 F.3d 1236, 1239 (9th Cir.), amended, 187 F.3d 1064, 1067-68 (9th Cir.

19  1999); Williams (Keith), 52 F.3d at 1484; (2) where there are no disputed facts and the claim

20  presents a purely legal question, see Williams (Keith), 52 F.3d at 1484; or (3) where the

21  issues presented can be resolved by reference to the state court record.  See Totten v. Merkle,

22  137 F.3d 1172, 1176 (9th Cir. 1998).

23       A district court has discretion to expand the record with discovery and documentary

24  evidence instead of conducting a full evidentiary hearing.  Williams (Stanley) v. Woodford,

25  384 F.3d 567, 590 (9th Cir. 2004), reh'g and reh'g en banc denied, 396 F.3d 1059 (9th Cir.

26  2005).  This permissible intermediate step may avoid the necessity of an expensive and time

27  consuming evidentiary hearing in every habeas corpus case.  Id. at 590-91.  That the issue to

28

1  be decided is one of credibility does not necessarily compel a full evidentiary hearing.  See

2  id. at 590-91.

3  **DISCUSSION**

4  **I.     Ineffective Assistance of Counsel Claims**

5       In Claims One, Two and Three, Petitioner argues that he received ineffective

6  assistance of counsel at all phases of his capital trial and that he was denied effective

7  assistance of appellate and habeas counsel.  To prevail on habeas on a claim of ineffective

8  assistance of counsel, a petitioner must establish both (1) that counsel's performance was so

9  deficient that it fell below an "objective standard of reasonableness" and (2) that the deficient

10  performance was prejudicial, rendering the results of his trial unreliable or fundamentally

11  unfair.  See Raley v. Ylst, 470 F.3d 792, 799 (9th Cir. 2006) (quoting Strickland v.

12  Washington, 466 U.S. 668, 688, 692 (1984)).  To establish prejudice, Petitioner "must show

13  that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

14  the proceeding would have been different.  A reasonable probability is a probability

15  sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.

16       **A.     Trial Counsel**

17       Respondent seeks summary judgment as to Petitioner's claim that his attorneys

18  provided ineffective assistance at all stages of his trial.  The state supreme court rejected this

19  claim on the merits.  State Rec. 46.  The Court concludes that Respondent has met his burden

20  to establish the absence of a genuine issue of material fact on Petitioner's ineffective

21  assistance claims.

22       **1.     Pre-trial Phase**

23       Petitioner's first set of trial counsel, Gordon Rockhill and Dek Ketchum, located and

24  moved inculpatory physical evidence--a trunk, a knife, a skirt and a sweater--after Petitioner

25  told them where he left the items.  Am. Pet., ¶ 299.  The prosecution learned of these items

26  from Petitioner's jailhouse letters to Szymkiewicz.  See State Rec. 1 at 133, 147 ("I foolishly

27  told lawyer where weapons were cause he said with those, no problem for 2nd degree;" "my

28  attorneys now have weapons & D.A. doesn't know it yet!").  On July 22, 1986, the

United States District Court
For the Northern District of California

1    prosecution filed a motion to compel production of the evidence.  In opposition, defense

2    counsel argued that if they did possess the evidence, they had no duty to produce them prior

3    to trial, asserting Petitioner's privilege against self-incrimination under <u>Goldsmith v.</u>

4    <u>Superior Court</u>, 152 Cal. App. 3d 76 (1984).  The trial court denied the prosecution's motion

5    to compel, but the Court of Appeal issued a writ of mandate, clarifying that when defense

6    counsel removes, possesses, or alters physical evidence, counsel must immediately inform

7    the court.  <u>People v. Superior Court (Fairbank)</u>, 192 Cal. App. 3d 32, 39-40 (1987) (citing

8    <u>People v. Meredith</u>, 29 Cal. 3d 682 (1981)).  The Court of Appeal held that the trial court,

9    exercising care to shield privileged communications and defense strategies from prosecution

10    view, must then ensure that the prosecution has timely access to the evidence and timely

11    information about its alteration.  <u>Id.</u> at 40.

12           Pursuant to the Court of Appeal's writ of mandate, the trial court held an in camera

13    hearing at which counsel Rockhill represented that his and co-counsel's intention in taking

14    this evidence was "to use them in the course of the trial, because the credibility of Mr.

15    Fairbank, who is also anticipated [to] testify, [is] absolutely critical in this case. . . . It was my

16    thought that if we could show the jury that Mr. Fairbank was willing to come forward with

17    . . . actual physical evidence to show that what he says has verity, then the jury would [be]

18    willing to give him a measure of credibility that they probably would not be willing to give

19    him without something physical to back-up his account of what happened on the night in

20    question."  State Rec. 24 at 5.  Rockhill conceded that a defense expert had tested the blood

21    in the trunk and believed that the blood was consistent with the victim's blood.  State Rec. 24

22    at 10.  Rockhill also revealed that defense counsel searched for a fork to validate Petitioner's

23    version and explain the number of stab wounds, but they were unsuccessful.  State Rec. 24 at

24    10.

25           The trial court ordered defense counsel to produce the physical evidence to the

26    prosecution, noting that "it may be a crime for them not to do so."  State Rec. 25 at 18.

27    Defense counsel agreed to comply but advised the trial court that they would seek a

28    protective order to protect the strategies described to the court during the in camera

United States **District** Court

For the Northern District of California

1   proceedings.  State Rec. 25 at 16.  The following day defense counsel produced a wooden

2   handle knife with an 8-inch blade, a skirt and sweater with various hair, fiber and debris, and

3   a green steamer trunk.  State Rec. 1 at 498-99.  Defense counsel also filed a declaration

4   stating that they discovered the knife on May 1, 1986 in San Francisco; the trunk on June 24,

5   1986 at a mobile home in San Francisco; and the clothing on June 7, 1986 off Skyline

6   Boulevard in San Mateo County.  State Rec. 1 at 500-502.

7        Defense counsel subsequently filed a motion for an order to protect the defense

8   strategy from prosecution view, asking that the physical evidence be returned to the defense

9   at the end of the prosecution's case-in-chief, and that the defense be allowed to introduce the

10  items at trial, prior to which, the jury would not be informed that defense counsel had control

11  of the evidence.  State Rec. 1 at 445-46.  At a hearing the following week, the trial court

12  denied the motion for protective order.  State Rec. 10 at 7.  Defense counsel filed a petition

13  for a writ of prohibition, which the Court of Appeal denied; the California Supreme Court

14  subsequently denied the petition for review.  State Rec. 26 at 54.

15       On January 20, 1988, when the trial court and counsel learned that the state supreme

16  court denied review on the motion for protective order, Rockhill and co-counsel moved to

17  withdraw from representation on the grounds that denial of the protective order "made it

18  impossible for us to represent Mr. Fairbank without grave risk . . . that the presence of myself

19  and Mr. Ketchum would deny Mr. Fairbank . . . due process."  State Rec. 26 at 58.  The trial

20  court granted the motion to withdraw, at which point Cliff Cretan and Jeff Boyarsky were

21  designated new counsel.  State Rec. 26 at 59.

22       The prosecution subsequently moved to compel notes, diagrams, photographs, test

23  results and other information concerning the physical evidence.  The trial court held an

24  evidentiary hearing and permitted limited questioning about where and how the evidence was

25  obtained, how it was preserved, and the procedures used in testing the evidence.  Former

26  defense counsel Rockhill and Ketchum, defense investigator, John Stevenot, and their

27  forensic expert testified at the hearing on October 27, 1988.  State Rec. 29 at 162-280.

28

The prosecution also moved to find a partial waiver of the attorney-client privilege arising from Petitioner's notes and discussions with inmate John Szymkiewicz. Szymkiewicz testified to authenticate the letters he received from Petitioner. State Rec. 29 at 321-360. He explained that he considered falsely admitting to the murder before approaching police officers about a deal to reduce his own sentence in exchange for the information on Petitioner. State Rec. 29 at 356. The letters reflected details about the crime that Petitioner instructed him to remember, such as Szymkiewicz putting the trunk in the car, the weapons being placed in the bushes about a mile from the crime scene, and Petitioner telling his attorneys where the weapons were hidden. State Rec. 29 at 321-326. The trial court denied the motion to find partial waiver of attorney-client privilege on the ground that the evidence was insufficient to find that Petitioner disclosed a significant part of his communications with his attorneys. State Rec. 29 at 368-369.

The prosecutor read the content of some of the jailhouse letters during the guilt phase opening statement, including the reference to Petitioner's attorneys having the weapons, although the prosecutor advised the jury that those attorneys were not the present trial counsel. State Rec. 29 at 2698-2702. The items recovered by defense counsel were introduced during the penalty phase, although the letters recounting the details of the crime were not.

Petitioner contends that his former defense counsel's strategy for obtaining the inculpatory evidence--that is, to produce the evidence through Petitioner at trial to boost his credibility--was unreasonable because (a) counsel should have known that once they took physical control of the items they were bound to inform the court; (b) if counsel had left the evidence alone it would never have been discovered and used against Petitioner at trial; and (c) counsel's possession of the evidence compromised their ability to represent Petitioner. Am. Pet., ¶¶ 313-315. Petitioner claims that as a result of counsel's deficient performance, he was denied an opportunity to present a meritorious mental state defense and was coerced by his replacement counsel into pleading guilty without reciprocal benefit. Id., ¶ 319.

United States District Court

For the Northern District of California

1   Petitioner argues that the reasonableness of his attorneys' performance creates a disputed

2   issue of fact to defeat Respondent's motion for summary judgment.  Am. Opp. at 8-9 and n.6.

3          The California Supreme Court addressed this claim on direct appeal and held that the

4   record is insufficient to support a finding of incompetent performance, and that, in any event,

5   the evidence does not establish a reasonable probability of prejudice:

6          We cannot conclude that defendant's original trial counsel
           were incompetent without further development of the factual
7          record, including, if available, sworn testimony addressing
           why counsel moved the evidence.  The record indicates that
8          counsel intended to offer the evidence as part of the defense
           case in order to establish defendant's credibility, but this
9          explanation, which appears in unsworn statements counsel
           made to the trial court, may not be complete or wholly
10         accurate.  Therefore, whatever we might conclude about the
           reasonableness of counsel's purported strategy, the current
11         record is inadequate to justify a finding that counsel were
           incompetent.
12
           In any case, when considering a claim of ineffective
13         assistance of counsel, "a court need not determine whether
           counsel's performance was deficient before examining the
14         prejudice suffered by the defendant as a result of the alleged
           deficiencies. . . . If it is easier to dispose of an ineffectiveness
15         claim on the ground of lack of sufficient prejudice, which we
           expect will often be so, that course should be followed."
16         [Strickland, 466 U.S. at 697.]

17   Fairbank, 16 Cal. 4th at 1241.  The court held that Petitioner had not established that the

18   knife, trunk and clothing played a key role in his decision to plead guilty, noting that he did

19   not raise that argument in his motion to withdraw his guilty plea.  Id. at 1242.  Moreover,

20   other evidence of guilt supported its conclusion that "defendant has not established a

21   'reasonable probability' that he would not have pleaded guilty if the prosecution had never

22   obtained the knife, the clothes, and the steamer trunk."  Id.   That evidence includes

23         the location of Cheek's car near defendant's apartment, fresh scratches on
           defendant's face on the evening Cheek disappeared, traces of blood under
24         Cheek's fingernails, defendant's admission to Kitchell that he was involved in
           a murder, the large hole in defendant's carpet, defendant's varied efforts to
25         conceal evidence of the crime, blood in defendant's apartment that closely
           matched Cheek's blood, blood in Kitchell's car, blood on Kitchell's red
26         bodysuit, defendant's detailed notes to Szymkiewicz indicating private
           knowledge about the crime and the murder weapons, defendant's request that
27         Szymkiewicz hire someone to injure Kitchell and Stracener, Arlene [Gemmil's]
           testimony that defendant sexually assaulted her just a week before Cheek
28         disappeared and that he repeatedly called a pornography telephone number

1

2

3

> during the course of the assault, telephone calls from defendant's apartment to [the same] pornography telephone number on the day Cheek disappeared, and Jennifer Roth's testimony that defendant recklessly pulled the trigger on a partially loaded pistol while pointing it at her head.

4   Id.

5        In light of this overwhelming evidence of Petitioner's guilt, the Court cannot

6   conclude that the state supreme court's determination of no prejudice is an unreasonable

7   application of federal law.  Moreover, neither the knife, skirt nor sweater retrieved by

8   counsel had sufficient blood samples to identify with the murder victim; rather, this evidence

9   served primarily to corroborate other evidence of guilt.  In addition, the prosecutor argued

10  that at some point before the victim died, she had to take off her clothes to wear the red

11  bodysuit, which had her blood on it; thus the evidentiary impact of the skirt and sweater was

12  minimal.  State Rec. 29 at 3595-96.

13       Petitioner has also not demonstrated prejudice from the fact that it was his attorneys

14  who recovered the knife, trunk and clothing.  Counsel withdrew upon the state supreme

15  court's denial of the petition for review of the denial of the protective order.  Furthermore,

16  the prosecution stipulated that the jury be instructed that the counsel referred to in the

17  Szymkiewicz letters were not Petitioner's current trial counsel.  State Rec. 29 at 431.

18       Petitioner is not entitled to discovery and an evidentiary hearing on this claim.  He

19  does not explain how such discovery will demonstrate prejudice, that is, how it will refute the

20  state supreme court's determination that Petitioner was not prejudiced by his counsel's

21  retrieval of the evidence in light of the other overwhelming evidence of his guilt.  His request

22  for discovery and an evidentiary hearing on whether counsel's conduct was constitutionally

23  deficient is moot in light of the state supreme court's reasonable determination that,

24  regardless of counsel's unreasonable representation, Petitioner has not demonstrated

25  prejudice as required by Strickland.

26       Petitioner also suggests in a footnote that pre-trial counsel was ineffective by failing to

27  persuade the District Attorney's Office not to charge him with murder in the first degree or to

28  seek the death penalty.  Am. Opp. at 8 n.6.  In support of this suggestion, Petitioner offers a

**United States District Court**
For the Northern District of California

statement by the victim's family opposing the death penalty. Am. Pet., ¶ 322 and Ex. 142. The record indicates, however, that the prosecution was aware of the victim's family's views on the death penalty, and nonetheless urged the trial court to uphold the jury's death verdict. In light of these circumstances, pre-trial counsel's behavior was not objectively unreasonable. Petitioner's request for discovery is denied as he does not identify what discovery and how discovery would aid him in demonstrating otherwise.

The California Supreme Court's determination that defense counsel's pretrial conduct --even if constitutionally deficient--did not amount to ineffective assistance of counsel because of the overwhelming other evidence of guilt is not contrary to nor an unreasonable application of federal law. Respondent is therefore entitled to summary judgment as to Claim One on the subclaim alleging ineffective assistance during the pre-trial phase.

### 2.     Jury Selection

"Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. Similarly, lack of adequate voir dire impairs the defendant's right to exercise peremptory challenges where provided by statute or rule . . . ." Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (citation omitted).

Petitioner contends that counsel were ineffective at voir dire by conceding Petitioner's guilt and telling veniremembers that they would only decide the degree of murder and whether the special circumstances of torture, rape and forced oral copulation were true. Am. Pet., ¶¶ 326-328. Petitioner emphasizes that prospective jurors expressed confusion about counsel's concession of guilt, and questioned their role as jurors if Petitioner had already admitted guilt. State Rec. 29 at 816. In response to these comments, defense counsel explained that "there are different degrees of murder and there are different allegations as to how the murder occurred and why it occurred and those have to be decided." State Rec. 29 at 817.

United States District Court

For the Northern District of California

Petitioner raised these challenges to counsel's performance on direct appeal. The California Supreme Court held that "[d]uring voir dire, counsel could reasonably have decided, in light of very strong evidence that defendant killed Cheek, to concede that point and focus the jury's attention on the degree of murder and the truth of the special circumstances. Defendant cites no case suggesting this strategy constitutes ineffective assistance." Fairbank, 16 Cal. 4th at 1243. Petitioner now argues that there is a factual dispute about whether the allegedly deficient performance was part of any strategy. Am. Opp. at 9. However, Petitioner fails to offer evidence or identify material facts that raise a genuine issue of fact on this claim. Furthermore, the evidence in the record, including excerpts of the voir dire transcripts cited by Petitioner, demonstrates that defense counsel were aware of the veniremembers' confusion about admitting that Petitioner was responsible for the victim's death, and responded to their questions throughout the voir dire process, emphasizing that each degree of murder has different intent requirements and eliciting candid opinions from the potential jurors about degrees of murder and drug abuse. See State Rec. 29 at 943 ("The evidence will show that Mr. Fairbank killed Wendy Cheek. There's no doubt about that. The issue that the jury who is selected in this case is going to have to decide is going to be his degree of guilt."); 945-46 ("You'll be instructed, if you sit on this jury, that there are varying degrees of murder. . . .There's different mental intents involved in each of those degrees."); 951 ("You are going to hear words 'premeditation' and 'deliberation.' What does that mean? These are definitions. And subject to interpretation."); 968-69 ("even though Mr. Murray is going to prove evidence that, or give evidence in court that's going to prove that Mr. Fairbank did it. We're simply not going to be contesting that evidence. That's what we're gonna tell you."); 985 ("We are not talking about excusing conduct or defending conduct. What we're really talking about his [sic] how the drug affects your minds so that you can determine what your criminal responsibility is.").

Petitioner has not demonstrated that trial counsel's decision to concede guilt during voir dire fell below an objective standard of reasonableness. See Florida v. Nixon, 543 U.S. 175, 191 (2004) (noting that avoiding execution may be "'the best and only realistic result

United States District Court
For the Northern District of California

possible'" when the evidence is overwhelming and the crime heinous).  Furthermore, Petitioner has not shown that he was prejudiced by counsel's concession in light of the overwhelming evidence of guilt.  The state supreme court's denial of this subclaim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts.  Accordingly, Respondent is entitled to summary judgment on this subclaim.

Petitioner also argues that trial counsel only occasionally questioned prospective jurors about drug use, but the record indicates that the potential jurors were asked in a written questionnaire about alcohol abuse and were aware that issues of drug and alcohol addiction would arise in the trial, as individual veniremembers commented on their experience with substance abuse.  Defense counsel asked questions on that subject with individual jurors, as did the prosecution.  See State Rec. 29 at 912 ("Do you have a feeling that if someone is under the influence that they shouldn't be held accountable for what they do?"); 972 ("You heard my questions about drug and alcohol abuse affecting your decision . . . do you have any problem with that?"); 993 ("Do you have any bias against people who have unfortunately become addicted to drugs or alcohol based on your experience?"); 1000-01 ("I pretty well covered the main areas that I wanted to cover at this stage of the questioning, so I don't want to go through everything in detail again.  Keep in mind what I have asked.  Did anything come to your mind when I talked about the case and what the issues are? [Juror responds about drug and alcohol related situation.]"); 1009 ("You've had no contact with anybody who's been the victim of alcohol abuse or drug abuse or known anybody who has?").   This argument, too, fails.

### 3.    Guilt Phase and Guilty Plea

Petitioner contends that trial counsel were ineffective once trial began for declining to present an opening statement and then only briefly cross-examining four of the prosecution's eight witnesses, particularly regarding the absence of evidence that Petitioner sexually assaulted Ms. Cheek.  Am. Pet., ¶¶ 334, 335.  Petitioner also contends that trial counsel failed

United States District Court

For the Northern District of California

1  to present mental state defenses during the guilt phase, and wrongfully advised him to plead

2  guilty without any reciprocal benefit.  Am. Pet., ¶ 336, 338.

3      Petitioner's unconditional guilty plea limits the grounds on which he may seek habeas

4  relief.  See Haring v. Prosise, 462 U.S. 306, 319-20 (1983) (guilty plea forecloses challenges

5  to conviction based on pre-plea constitutional deprivations).  A defendant who pleads guilty

6  on the advice of counsel cannot later raise in habeas corpus proceedings independent claims

7  relating to the deprivation of constitutional rights that occurred before the guilty plea.  Tollett

8  v. Henderson, 411 U.S. 258, 266-67 (1973).  He may only attack the voluntary and intelligent

9  character of the guilty plea by showing that the advice he received from counsel was not

10  within the range of competence demanded of attorneys in criminal cases.  Lambert v.

11  Blodgett, 393 F.3d 943, 979 (9th Cir. 2004) (quoting Hill v. Lockhart, 474 U.S. 52, 56-57

12  (1985)).

13      With Petitioner's claim thus limited to the soundness of trial counsel's advice to plead

14  guilty, the Court concludes that the state supreme court reasonably applied the Strickland

15  standard to determine that Petitioner's guilty plea and admission of the special circumstance

16  allegations "were reasonable tactical decisions in light of the compelling evidence against

17  defendant, and therefore they do not establish ineffective assistance of counsel."  Fairbank,

18  16 Cal. 4th at 1243.  Although Petitioner contends that he received no reciprocal benefit by

19  pleading guilty, the state supreme court held that Petitioner's guilty plea and other

20  admissions "enabled him to gain exclusion of many of the notes he wrote to Szymkiewicz,

21  because they primarily evidenced consciousness of guilt, which was no longer relevant after

22  the guilty plea."  Id.  See State Rec. 29 at 2892.  The state supreme court also noted that by

23  pleading guilty,  Petitioner could cast himself in a more sympathetic light, as counsel argued

24  that Petitioner accepted responsibility for his crime by pleading guilty.  Fairbank, 16 Cal. 4th

25  at 1244.

26      Petitioner responds that any strategic benefit from entering the plea was undermined

27  by the fact that counsel waited until the state had presented a day and a half of evidence.

28  Am. Opp. at 11 n.10.  The state supreme court, however, noted that the prosecution had only

presented a small portion of its evidence, and did it did not repeat presentation of that evidence during the penalty phase. <u>Fairbank</u>, 16 Cal. 4th at 1244. Following the guilty plea, the trial court excluded inculpatory evidence that Petitioner purchased gasoline about six or seven hours after committing the crime at a gas station off Highway 280, en route to the location where the victim's burned body was found, ruling that it had insufficient probative value in the penalty phase. State Rec. 29 at 2823, 2891. Moreover, defense counsel relied repeatedly on Petitioner's admission of guilt in urging the jury to impose a life sentence. <u>See</u>, <u>e.g.</u>, State Rec. 29 at 3639 ("Well, by his guilty plea in this case, Mr. Fairbank, I think, has made a[s] strong a statement to you as he can that he is not, at least, that extreme person . . . ."); <u>id.</u> at 2662 ("after a lifetime of wrong doing, a lifetime of denying responsibility, for one of the few times in his life he did something right and appropriate, pled guilty to these charges.")

Petitioner next contends that counsel's advice to plea guilty was unreasonable because he had a viable mental state defense, namely, that the evidence of mental illness and drug and alcohol addiction would show that he did not formulate the mental intent required for the charges against him. The record demonstrates, however, that trial counsel considered this defense; they indicated even during voir dire that the intent requirement would be at issue and asked jurors for their opinions about medical experts and drug and alcohol abuse. As the prosecution argued, however, Petitioner's significant efforts to dispose of evidence of the crime and his jailhouse letters to Szymkiewicz recalling specific details of the crime and threatening witnesses evidenced consciousness of guilt. <u>See</u> State Rec. 29 at 435, 2897. Furthermore, defense counsel were aware that the prosecution would argue that Petitioner had a motive to murder Ms. Cheek based on Petitioner's arrest only one week earlier on the Gemmil crime, and his subsequent release with charges still pending, suggesting that he would not risk keeping another witness alive. State Rec. 29 at 418. In order to satisfy <u>Strickland</u>'s prejudice requirement on an ineffective assistance challenge to a guilty plea, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill</u>, 474 U.S.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    at 58-59.  Given the strength of the prosecution's case, including the ample evidence

2    demonstrating intent notwithstanding Petitioner's substance abuse, counsel's advice to plea

3    guilty was not unreasonable.

4         Petitioner next claims that trial counsel were ineffective in advising him to admit the

5    special circumstances because he was factually innocent of the special circumstance

6    allegations of torture-murder and of attempted oral copulation.  Am. Pet., ¶ 354;  see also

7    Am. Pet., ¶¶ 508-525 (Claim Six) and ¶¶ 526-549 (Claim Seven).  In denying the motion for

8    new trial, the trial court found that it was satisfied beyond a reasonable doubt that there was a

9    factual basis for the admission of the two special circumstances.  State Rec. 29 at 4018.

10        The evidence of torture included "[t]he length of time from the first vicious blow . . .

11   to the victim until her death and the fact that more than one weapon was used; [and] medical

12   evidence . . . that the victim was struck about the face, head and body numerous times by the

13   defendant's fists and was repeatedly stabbed with a screwdriver-like weapon in the back of

14   the head and neck."  State Rec. 29 at 4017-18, 4020.  As to the prolonged length of time that

15   the victim suffered, the evidence in the record indicates that Petitioner made several phone

16   calls to the pornographic recordings between 7:43 pm and 8:20 pm; furthermore, the victim's

17   sternum was bruised, with the beginnings of inflammation, which would take 20 minutes to

18   an hour to start.  State Rec. 29 at 3594.  The state supreme court concluded that counsel made

19   a reasonable strategic choice to admit the allegations in light of this evidence.  Fairbank, 16

20   Cal. 4th at 1242, 1245. This conclusion is not an unreasonable application of federal law.

21        Evidence of the special circumstance of oral copulation included circumstantial

22   evidence of similar conduct in the Gemmil crime one week earlier.  Evidence of prior sexual

23   assaults, if not too remote in time, is admissible to show intent.  Walters v. Maass, 45 F.3d

24   1355, 1358 (9th Cir. 1995).  Indeed, during pretrial proceedings the trial court noted, and trial

25   counsel conceded, that the Gemmil crime would be relevant to the oral copulation special

26   circumstance.  State Rec at 406-407.  Furthermore, the prosecution presented other evidence

27   of sexual assault, such as the phone calls to the sexually explicit recordings, the victim's

28   unclothed body, and the presence of her blood on the red bodysuit.  As Petitioner entered a

guilty plea and admitted the special circumstances, the Court need not test whether the

evidence was sufficient to support a conviction, but rather whether trial counsel's

performance was reasonable.  Faced with Ms. Gemmil's testimony about being lured into

Petitioner's apartment and forced into oral copulation the week before Ms. Cheek was

murdered, trial counsel acted reasonably by recommending that Petitioner admit the special

circumstance.

In any event, assuming, arguendo, that the circumstances of the Gemmil crime were

insufficient to support a conviction of attempted oral copulation, and that counsel acted

unreasonably by recommending that Petitioner plead guilty and admit that special

circumstance, such deficient performance would not be prejudicial because the torture special

circumstance alone would have been a sufficient basis for the jury to recommend the death

penalty; thus it is not reasonably probable that the result would have been more favorable for

Petitioner if he had not admitted the special circumstance of attempted oral copulation.  See

People v. Raley, 2 Cal. 4th 870, 889-891 (1992) (finding insufficient evidence to sustain

conviction of attempted oral copulation, but affirming convictions and capital sentence in

other respects).

Petitioner further contends that he was not advised at the time of entering his guilty

plea that the prosecution was required to prove the element of intent with regard to the

special circumstance of torture.  See Am. Pet., ¶¶ 550-562 (Claim Eight).  Petitioner first

raised this argument on direct appeal, then withdrew it, because prior to his guilty plea

Petitioner had been present in court for the hearing on his motion to dismiss the infliction of

torture special circumstance pursuant to section 995 of the California Penal Code.  State Rec.

34 (People v. Fairbank, Appellant's Reply Brief) at 33.  The special circumstance alleged

"that the murder was intentional and involved the infliction of torture within the meaning of

that Penal Code Section 190.2(A)(18)."  State Rec. 29 at 2794.  Although the statute did not

explicitly state a mens rea requirement for the torture special circumstance, both defense

counsel and the prosecution recognized on Petitioner's motion to dismiss that the state

supreme court had construed the special circumstance to require intent to inflict extreme

physical pain.  State Rec. 1 at 176-182 (Defendant's motion to dismiss special circumstances) (citing <u>People v. Davenport</u>, 41 Cal.3d 247 (1985); State Rec. 1 at 215-219 (Opp. to Mot. to Dismiss) (citing <u>Davenport</u>, 41 Cal.3d at 267).  <u>See Wade v. Calderon</u>, 29 F.3d 1312, 1320 (9th Cir. 1994) (citing <u>Davenport</u>), <u>overruled on other grounds</u>, <u>Rohan ex rel. Gates v. Woodford</u>, 334 F.3d 803 (9th Cir. 2003).  The prosecution emphasized that under <u>Davenport</u>, the defendant's intent, rather than the victim's awareness of pain, was an element of torture, and argued that Petitioner's intent to inflict torture could be inferred from the pathologist's testimony that the victim had thirteen stab or puncture wounds from two different instruments, and eleven areas of bruising.  State Rec. 1 at 216.  After hearing argument, the trial court denied Petitioner's motion to dismiss the torture special circumstance.  State Rec. 1 at 239.  Thus, Petitioner has failed to show that he was not aware of the intent requirement.

Petitioner's request for an evidentiary hearing on his claim of ineffective assistance at the guilt phase is denied.  He has not shown that the facts are in dispute and if resolved in his favor would entitle him to relief.  28 U.S.C. § 2254(e)(2);  <u>Karis v. Calderon</u>, 283 F.3d 1117, 1127 (9th Cir. 2002).

In sum, the California Supreme Court's denial of habeas relief on this claim of ineffective assistance during the guilt phase and entry of guilty plea was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts.  <u>See</u> <u>Florida v. Nixon</u>, 543 U.S. at 191-92 (recognizing that in capital cases with overwhelming evidence of guilt, counsel "may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared").  Accordingly, Respondent is entitled to summary judgment on this claim.

### 4.    Penalty Phase

Petitioner contends that trial counsel provided ineffective assistance during the penalty phase.  The gravamen of his complaint is that defense counsel failed to rebut the prosecution case in aggravation; instead counsel assisted the prosecution by offering evidence that Petitioner is a sociopath who does not suffer from any mental illness.  Am. Pet., ¶¶ 358-412.

The state supreme court denied habeas relief on these penalty phase claims on the merits. State Rec. 46.

To perform effectively in the penalty phase of a capital case, counsel must investigate, develop and present mitigation evidence during the penalty phase proceedings. <u>Summerlin v. Schriro</u>, 427 F.3d 623, 630 (9th Cir. 2005) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521-23 (2003)). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Strickland</u>, 466 U.S. at 690-91. Similarly, a decision not to present a particular defense or not to offer particular mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover the facts that might be relevant to his making an informed decision. <u>See</u> <u>Lambright v. Schriro</u>, 490 F.3d 1103, 1116 (9th Cir. 2007) (citing <u>Wiggins</u>, 539 U.S. at 522-23). To fulfill his duty to investigate, counsel must sufficiently investigate and prepare to be able to present and explain the significance of all the available mitigating evidence. <u>See</u> <u>Allen v. Woodford</u>, 395 F.3d 979, 1000 (9th Cir. 2005) (citing <u>Mayfield v. Woodford</u>, 270 F.3d 915, 927 (9th Cir.2001) (en banc)).

"To that end, the investigation should include inquiries into social background and evidence of family abuse," as well as evidence of drug and alcohol abuse, mental impairment, including mental health records, and physical health, particularly evidence of potential organic brain damage and other disorders. <u>Summerlin</u>, 427 F.3d at 630. Furthermore, "counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." <u>Caro v. Woodford</u>, 280 F.3d 1247, 1254 (9th Cir. 2002).

### a.    The Psychological/Mental State Evidence

Petitioner argues that his counsel was ineffective by presenting Dr. Fricke's testimony that Petitioner suffers from antisocial personality disorder, that is, that he is a sociopath and is fully responsible for his conduct. Petitioner contends that such testimony was aggravating rather than mitigating evidence; defense counsel, in effect, performed the prosecutor's job for him.

The state supreme court rejected this argument on direct appeal:

> Dr. Fricke's partly negative evaluation of defendant is hardly surprising in light of defendant's negative personal history. Defense counsel may well have concluded that Dr. Fricke would gain credibility with jurors by being forthright rather than trying to pretend defendant was someone he clearly was not. In fact, counsel argued to the jury, "Jurors come to court . . . assuming that the defense attorneys are going . . . to try to, perhaps put a white wash over what the defendant is and what he's' done. . . . [W]e've done the opposite."

> Moreover, the thrust of Dr. Fricke's testimony was favorable to defendant. Dr. Fricke explained how defendant's inherent qualities and the different elements of his troubled upbringing combined to his detriment. Dr. Fricke confirmed that defendant's drug abuse played an important role in his violent criminal behavior. Finally, Dr. Fricke opined that defendant would respond well in the structured environment of prison. Dr. Fricke's testimony that defendant was responsible for his behavior was consistent with defendant's guilty plea and did not undermine his defense. In sum, we cannot say that counsel's decision to use Dr. Fricke as an expert witness "fell below an objective standard of reasonableness . . . under prevailing professional norms."

Fairbank, 16 Cal.4th at 1250.

The state court's finding as to defense counsel's penalty phase strategy is not unreasonable; to the contrary, the trial record demonstrates that the decision to present evidence that Petitioner suffers from an antisocial personality disorder was calculated to support the argument for life in prison instead of death. The thrust of defense counsel's closing argument was that Petitioner's sociopath condition–unlike some mental illnesses–is controllable, especially in prison; thus, the death penalty is not necessary to protect the public from Petitioner. See, e.g., State Rec. 29 at 3637 ("It's a controllable disorder in that the sociopath can be controlled by external sources."). Moreover, defense counsel expressly acknowledged that the defense had presented negative information about Petitioner, but that it had done so, as found by the state court, to gain credibility with the jury:

> You may wonder why [defense counsel] and I would present so much negative information about Mr. Fairbank ourselves. We brought Mr. – Doctor Fricke here to establish for you that in fact he is a sociopath. In fact he is an antisocial personality. And we brought out some bad things about him, bad things that he's done that even the prosecution didn't bring out.

> Jurors come to court, I would think, assuming that the defense attorneys are going to try to minimize the situation, to try to, perhaps put a white wash over what the defendant is and what he's done. We're quite aware in this case that we've done the opposite. We've brought out more bad than you than heard from [the prosecution]. But you needed to hear all this in order to understand

United States District Court
For the Northern District of California

1   him.  And I think if you can look at the psychology of Mr. Fairbank, you can
2   see that he is controllable.

3   Id. at 3637-38.

4          The state court's conclusion that counsel's strategy did not constitute ineffective

5   assistance of counsel was not an unreasonable application of federal law.  In Beardslee v.

6   Woodford, 358 F.3d 560 (9th Cir. 2004), Beardslee challenged defense counsel's

7   presentation in the penalty phase of an expert who characterized Beardslee as a sociopath.

8   Id. at 582.  As does Petitioner here, Beardslee argued that counsel failed to recognize that

9   such testimony would be harmful rather than mitigating.  Id.  The Ninth Circuit affirmed the

10  district court's denial of this claim without an evidentiary hearing.  The court noted that the

11  expert provided some useful mitigating evidence and the "fact that he also provided some

12  damaging testimony does not mean that the decision to use him as a witness fell below an

13  objective standard of reasonableness." Id. at 583.  "Rather, it presented a strategic decision.

14  Whether or not it may have been better to forgo [the expert's] testimony, the record does not

15  show that Beardslee's counsel failed to make reasonable decisions untethered to trial

16  strategy." Id.  There is simply no basis under the AEDPA for this Court to conclude that

17  counsel's strategy here was constitutionally ineffective; rather, the Court's independent

18  review of the record demonstrates that it was a reasonable strategy in light of the

19  circumstances.  That the strategy ultimately did not succeed is not a basis for finding

20  ineffective assistance of counsel.

21         Petitioner next contends that even if defense counsel were not constitutionally

22  ineffective merely by characterizing a defendant as a sociopath in a penalty phase trial, they

23  were ineffective here because Dr. Fricke's testimony that Petitioner suffered from antisocial

24  personality disorder was incorrect.  Petitioner relies primarily on the habeas declaration of

25  Dr. S. Alex Stalcup, a specialist in addiction medication, to contend that Petitioner suffered

26  from borderline personality disorder and toxic psychosis at the time of the murder.  He

27  argues that his counsel were ineffective by not portraying him as such given that he was tried

28  for the Gemmil crime before the capital trial and his expert, Dr. Fred Rosenthal, testified that

United States District Court

For the Northern District of California

1   he suffered from precisely those disorders--borderline personality disorder and toxic

2   psychosis.  Dr. Rosenthal's testimony was consistent with Petitioner's medical records which

3   reflect diagnoses of Petitioner as suffering from drug and alcohol addiction and borderline

4   personality disorder.  As a result, argues Petitioner, defense counsel should have known of

5   the other diagnoses and thus known that the sociopath diagnosis was wrong.

6          Petitioner's contention fails for several reasons.  First, Petitioner's experts agree with

7   Dr. Fricke that Petitioner had a personality disorder.  See Exh. 273, Declaration of S. Alex

8   Stalcup, M.D., ¶ 55 (testifying that Petitioner's symptoms would place him in the "Cluster B"

9   of personality disorders which include Antisocial, Borderline, Histrionic and Narcissistic");

10  Exh. 169 (expert testimony of Dr. Fred Rosenthal in Gemill trial) at 158-59 (testifying that

11  Petitioner has two major disorders: an addiction problem with drugs and alcohol and

12  borderline personality disorder); Exh. 271, Declaration of Judith V. Becker, licensed

13  psychologist, ¶ 72.  They disagree on how to characterize that personality disorder.  Dr.

14  Stalcup and Dr. Becker both opine that Petitioner had "personality disorder, not-otherwise

15  specified," that is, a personality disorder with traits from antisocial, borderline, histrionic and

16  narcissistic.  Petitioner points to no evidence in the record–or evidence that could be

17  discovered–that suggests that defense counsel were ineffective because they accepted Dr.

18  Fricke's diagnosis of antisocial personality disorder rather than insisting on a diagnosis of

19  personality disorder, not-otherwise specified.

20         Second, Petitioner has not shown how testimony that Petitioner had borderline

21  personality disorder or personality disorder not-otherwise-specified rather than antisocial

22  personality disorder would have mattered to the jury's determination.  The Diagnostic and

23  Statistical Manual of Mental Disorders (DSM-III-R) attached to Dr. Stalcup's declaration

24  demonstrates that the disorders are similar; indeed, the Manual notes that borderline

25  personality disorder is often accompanied by features of antisocial personality disorder.

26         Third, assuming, as Petitioner contends, that an antisocial personality disorder

27  diagnosis is "more negative" than a borderline personality disorder or personality disorder

28  not-otherwise-specified, the record demonstrates–as found by the state court–that defense

G:\CRBALL\1998\1027\Order re Summary Judgment.wpd 3 3

United States District Court

For the Northern District of California

counsel made a deliberate, tactical decision to characterize Petitioner in a negative light in order to gain credibility with the jury. Counsel's strategy was to concede Petitioner's negative characteristics so that the jury would be more likely to accept counsel's argument that the death penalty was unnecessary because Petitioner's antisocial personality disorder could be controlled in the structured environment of prison. State Rec. 29 at 3638; see supra at 31-32. This is not a case where defense counsel made no inquiry and did not make any tactical decisions; the trial record demonstrates a deliberate penalty phase strategy.

Fourth, defense counsel made a deliberate, tactical decision not to offer evidence that Petitioner suffered from toxic psychosis at the time of the murder. While they offered evidence from Dr. Clark as to the effects of drug abuse, their decision not to introduce evidence of Petitioner's mental state at the time of the offense prevented the prosecution from admitting the Szymkiewicz letters detailing the crime to impeach any suggestion that Petitioner was mentally impaired on the night of the murder. State Rec. 29 at 3229-30; 3439. The lack of a mental state defense was also consistent with their strategy of not offering excuses for Petitioner, but instead arguing that he has accepted responsibility and is controllable. State Rec. 29 at 3632, 3633 (defense counsel stating in closing argument: "I don't intend to say anything today to suggest that Mr. Fairbank is not fully accountable for what he's done;" "We are not presenting an excuse. There is no excuse."). Defense counsel specifically addressed the lack of a mental state defense during closing argument:

> As you know from the discussion during jury selection, the person's mental state can be, under the circumstances, a defense to the degree of the crime. As you also know from jury selection, drugs in certain circumstances, drug usage can be a defense to the degree of a crime, a legal defense. Those conditions, the mental conditions and the drug conditions do not exist here. This is not a legal defense to guilt that we are presenting to you. And Mr. Fairbank, as I said, accepted that realization shortly after the trial began and pled guilty to first-degree murder with special circumstances.

State Rec. 29 at 3634. Thus, defense counsel specifically considered and rejected a toxic psychosis at the time of the crime defense. Such a tactical decision is not ineffective assistance of counsel. Moreover, while Petitioner did make a toxic psychosis/mental state defense in the Gemmil trial based on Dr. Rosenthal's testimony, the jury rejected the defense

1  and convicted Petitioner.  Defense counsel cannot be faulted for adopting a different strategy

2  in this case.

3       Finally, Petitioner argues that the jury was prevented from considering Petitioner's

4  antisocial personality disorder as mitigating evidence because Dr. Fricke testified that it is

5  not a mental illness.  Am. Pet., ¶ 393.  <u>See</u> Cal. Penal Code § 190.3(h) (1989) ("Whether or

6  not at the time of the offense the capacity of the defendant to appreciate the criminality of his

7  conduct or to conform his conduct to the requirements of law was impaired as a result of

8  mental disease or defect, or the affects of intoxication.").  Petitioner's premise is wrong: the

9  trial court instructed the jury to consider "[a]ny other circumstance which extenuates the

10  gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or

11  other aspect of the defendant's character or record that the defendant offers as a basis for a

12  sentence less than death, whether or nor related to offense for which he is on trial."  State

13  Rec. 29 at 3674-75.   Indeed, at the hearing on Petitioner's post-trial motions, replacement

14  counsel urged that the penalty phase evidence of Petitioner's cocaine dependency and

15  antisocial personality was so substantial as to compel a sentence other than death.  State Rec.

16  29 at 4007.

17                        **b.      Investigation of mitigation evidence**

18       Petitioner also challenges trial counsel's investigation of mitigation evidence and he

19  asserts that they failed to provide adequate guidance and information to the defense expert

20  witnesses, and failed to uncover evidence of his mental defects, including significant brain

21  damage, debilitating drug and alcohol addiction, depression, attention deficit hyperactivity

22  disorder, and post-traumatic stress disorder.  Am. Pet., ¶¶ 365 (subclaim 8.b), 381 (subclaim

23  8.c) and Exs. 271-273, 298; Am. Opp., Ex. 302.  Petitioner first raised this challenge in his

24  state habeas petition, which the state supreme court denied on the merits without reasoned

25  opinion.  <u>See</u> State Rec. 41, ¶¶ 373-87; State Rec. 46.

26       The Ninth Circuit recently explained that

27       attorneys representing defendants in capital sentencing proceedings have an
        obligation to conduct a thorough investigation of [the defendant's] background.
28       They also have a duty to investigate and present mitigating evidence of mental

United States District Court

For the Northern District of California

1

> impairment . . . [,] [which] includes examination of mental health records.
> Furthermore, counsel has an affirmative duty to provide mental health experts
> with information needed to develop an accurate profile of the defendant's
> mental health.  The defendant's history of drug and alcohol abuse should also
> be investigated.

Belmontes v. Ayers, __F.3d__, 2008 WL 2390140 *23 (9th Cir. June 13, 2008).  In

Belmontes, for example, the Ninth Circuit held that counsel's penalty phase representation

was ineffective due to the lack of adequate investigation of mitigation evidence.  Trial

counsel did not consult any experts for the penalty phase; counsel did not seek nor obtain the

petitioner's medical records, even though counsel knew that the petitioner had been

repeatedly hospitalized when a teenager; and although counsel knew the petitioner had a

history of drug abuse, he did not conduct any investigation in this area.  Id. at *25-26.

    The Court's independent review of the record reveals that unlike counsel in

Belmontes, defense counsel satisfied their obligations here: Dr. Fricke reviewed Petitioner's

personal history from birth and family history; he also traveled to Petitioner's hometown in

Connecticut and personally interviewed about twelve witnesses, four of whom testified at the

penalty phase.  See State Rec. 29 at 3474.  At trial, counsel presented mitigating testimony by

Petitioner's father, three people who testified about the verbal, mental and physical abuse

Petitioner experienced as a child as well as his parents' alcoholism, and two mental health

experts, Drs. Fricke and Clark.  Dr. Fricke not only reviewed Petitioner's medical records,

police reports, and trial testimony, but he also conducted several psychological tests and

referred Petitioner to a specialist for neurological tests.  Based on the test results, Dr. Fricke

ruled out psychosis, or mental illness, and neuropsychological impairment, and concluded

that Petitioner had antisocial personality disorder.  State Rec. 29 at 3522, 3525.

    Counsel's penalty phase investigation here is wholly unlike counsel's conduct in

Belmontes or the cases cited by Petitioner.  In Caro v. Woodford, 280 F.3d 1247 (9th Cir.

2002), for example, defense counsel failed to investigate and provide appropriate experts

with the information necessary to evaluate the petitioner's brain damage.  Id. at 1254.  Here,

in contrast, Dr. Fricke specifically analyzed whether Petitioner suffered brain damage and, to

do so, referred Petitioner to another specialist for testing.  Moreover, Petitioner does not

1    identify any information that counsel failed to provide to Dr. Fricke.  Petitioner simply

2    disagrees with Dr. Fricke's conclusion; such disagreement, however, even if Petitioner's

3    experts are correct that Petitioner does have brain damage, does not mean counsel were

4    ineffective because they accepted Dr. Fricke's opinion.

5         Petitioner's declarations do not create a genuine dispute of fact.  Even if true, that is,

6    even if Petitioner suffered from borderline personality disorder rather than antisocial

7    personality disorder, and even if he suffered from toxic psychosis at the time of the murder,

8    and even if he might have organic brain damage as suggested by habeas expert Dr. Perez

9    Arce, defense counsel's penalty phase representation was not ineffective.  Counsel's

10   investigation was sufficiently thorough.  Counsel presented mitigating social and family

11   background history.  And counsel presented evidence of Petitioner's substance abuse and

12   personality disorder in strategic manner, that is, in a manner calculated to convince the jury

13   that Petitioner does not pose a risk to society and therefore the penalty of death is

14   unnecessary.  That this strategy did not succeed does not entitle Petitioner to relief, or even to

15   discovery and an evidentiary hearing.

16                          c.    **Circumstances of Crime**

17        Petitioner also contends that trial counsel failed to adequately cross-examine state

18   witnesses about the circumstances of the Cheek crime and possible impairment of his mental

19   state, and failed to provide evidence of his mental state at the time of the crime.  Am. Pet.,

20   ¶¶ 360-61 (ineffective assistance subclaim 8.a); ¶ 382 (subclaim 8.d).  The state supreme

21   court denied these challenges on the merits without reasoned opinion on collateral review.

22   See State Rec. 46.  The Court has already addressed these issues.  The Court's independent

23   review of the record reveals that trial counsel sought to minimize evidence of the crime after

24   Petitioner entered his guilty plea,  State Rec. 29 at 2815, and that trial counsel made a

25   deliberate tactical decision not to introduce evidence of Petitioner's mental state at the time

26   of the offense in order to prevent the prosecution from admitting the Szymkiewicz letters

27   detailing the crime to impeach any suggestion that Petitioner was mentally impaired on the

28   night of the murder.  State Rec. 29 at 3229-30 (Dr. Clark); 3439 (Dr. Fricke).  In light of the

1    overwhelming prejudicial effect of those letters, counsel's tactical decision was not

2    unreasonable.

3            Petitioner also argues that trial counsel's decision to have Dr. Clark testify generally

4    about the effects of cocaine prevented the jury from hearing evidence of Petitioner's history

5    of substance addiction.  Am. Pet., ¶ 382.  The record, however, demonstrates otherwise: trial

6    counsel prepared Dr. Clark by asking him to review volumes of Petitioner's medical records

7    dealing with hospitalizations and treatment for substance abuse from 1981 to the time of

8    Petitioner's arrest in 1985, as well as court transcripts and reports related to the Cheek

9    murder and the Roth, Kitchell and Gemmil incidents.  State Rec. 29 at 3225-26.  Counsel

10   thus prepared Dr. Clark to opine that Petitioner "was, and continued to be up until the time of

11   his arrest, seriously addicted to cocaine," and that his behavior at the time of those incidents

12   was consistent with cocaine addiction.  Id.  Rather than asking Dr. Clark to opine as to

13   Petitioner's state of mind on the night of the crime, trial counsel chose to let the jury decide,

14   "based on what the facts are and based on [Dr. Clark's] general description [] of this kind of

15   problem."  State Rec. 29 at 3230.  Furthermore, trial counsel elicited testimony from Ms.

16   Roth and Ms. Kitchell that Petitioner's behavior was affected by drug use.  Again, in light of

17   the damaging nature of the potential impeachment evidence as to Petitioner's mental state

18   and significant evidence of the circumstances of the gruesome murder, trial counsel's

19   strategy was reasonable; at the very least, the Court cannot conclude that the state court's

20   determination that it did not constitute ineffective assistance of counsel was contrary to, or an

21   unreasonable application of, clearly established federal law.

                              **d.      Closing Argument**

23           Petitioner next contends that trial counsel's closing argument constituted ineffective

24   assistance because counsel referred to Petitioner as evil, not a good or sympathetic person.

25   Am. Pet., ¶ 409-412 (subclaim 8.g).  He relies on Visciotti v. Woodford, 288 F.3d 1097,

26   1118 (9th Cir. 2002), where the Court of Appeals affirmed habeas relief based on ineffective

27   assistance where defense counsel portrayed the defendant as a "bad seed" during closing

28   argument.  The United States Supreme Court, however, reversed Visciotti and held that the

California Supreme Court had properly considered the prejudicial effect of the closing argument.  <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25-27 (2002).  On Petitioner's direct appeal the state supreme court similarly considered trial counsel's closing argument and held that counsel's apparent strategy of invoking sympathy for the victim and expressing the jurors' likely emotions was reasonable under the circumstances.  <u>Fairbank</u>, 16 Cal. 4th at 1251.  Given the weight of the evidence and the <u>Strickland</u> presumption of competence, the state court's denial of relief based on Petitioner's challenge to trial counsel's closing argument was neither contrary to, nor an unreasonable application of, clearly established federal law.  <u>See</u> <u>Strickland</u> 466 U.S. at 688-89.

### e.   Photographs

Petitioner argues that trial counsel failed to object to the introduction of gruesome, inflammatory and redundant photographs of the victim, and failed to object when the pictures were placed close to the jury throughout the trial.  Am. Pet., ¶ 408 (subclaim 8.f).  This claim is related to the allegations raised in Claim Sixteen for trial error in admitting the photographic exhibits.  <u>See</u> Am. Pet., ¶¶ 682-699.  Petitioner argues that the photographs of the victim's body at the crime scene and during the autopsy had no probative value after Petitioner pled guilty to the murder and two special circumstances.  The state supreme court denied this claim on the merits without reasoned opinion.  State Rec. 46.

As Respondent notes in his motion for summary judgment, and as the Court's independent review of the record reveals, defense counsel did in fact object to the admission of close-up photographs of the victim's body at the scene of discovery and autopsy photographs, arguing that they had no probative value and were cumulative.  State Rec. 29 at 515-17.  <u>See also</u> State Rec. 1 at 676 (State's trial brief re: admissibility of photos).  Petitioner does not contend otherwise in his opposition to Respondent's motion.  Accordingly, this claim, too, fails.

### 5.   Motion for New Trial

Petitioner claims that counsel were ineffective because they did not litigate a motion for new trial, and instead had replacement counsel file and argue the motion to withdraw the

1   guilty plea.  Am. Pet., ¶ 356.  This claim fails as Petitioner cannot demonstrate any prejudice.

2   The state court's denial of habeas relief on this claim is therefore reasonable.

3                          **6.     Cumulative Error**

4          Finally, Petitioner contends that the cumulative effect of counsel's errors at the pre-

5   trial and guilt phases was prejudicial.  Am. Pet., ¶ 357.  The state supreme court denied this

6   claim on direct appeal, <u>Fairbank</u>, 16 Cal. 4th at 1245, and on collateral review.  State Rec. 46.

7   As Petitioner fails to show ineffective assistance at either the pre-trial or guilt phase, the state

8   court's denial of habeas relief is not contrary to nor an unreasonable application of federal

9   law.

10      **B.     <u>Cronic</u> Standard**

11         In Claim Two, Petitioner contends that trial counsel's deficient performance amounted

12   to a breakdown in the adversarial process, resulting in a presumptively unreliable verdict and

13   sentence under <u>United States v. Cronic</u>, 466 U.S. 648, 659 (1984).  Petitioner presented this

14   claim to the California Supreme Court in his state habeas petition, which the state supreme

15   court summarily denied on the merits without opinion.  The Court concludes based on its

16   own independent review of the record that the state court's denial of relief under <u>Cronic</u> is

17   reasonable.  <u>Himes</u>, 336 F.3d at 853.

18         On a claim of ineffective assistance, a presumption of prejudice is warranted if

19   counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing."

20   <u>Cronic</u>, 466 U.S. at 659.  Petitioner's allegations of deficient performance at specific points

21   during the proceedings are not sufficient to demonstrate a genuine issue of fact on his claim

22   that his trial counsel failed to challenge the government's case throughout the trial.  <u>See</u> <u>Bell</u>

23   <u>v. Cone</u>, 535 U.S. 685, 696-97 (2002) (applying <u>Strickland</u> presumption of competence

24   where habeas petitioner challenged counsel's failure to oppose prosecution at specific points,

25   rather than throughout the sentencing proceeding as a whole).

26         Petitioner argues that his trial counsel's "failure to competently and effectively

27   investigate any aspect of the case -- the circumstances of the crime, their client's drug

28   history, the bases for a mental health defense, or a legally viable guilt defense -- resulted in

40

United States District Court
For the Northern District of California

1  'circumstances [that were] so egregiously prejudicial that ineffective assistance of counsel

2  should be presumed.'"  Am. Pet., ¶ 425.  The record, however, demonstrates that Petitioner's

3  trial counsel secured medical experts and lay witnesses to testify at the penalty phase.

4  Through expert witnesses, counsel conducted a thorough investigation of Petitioner's life

5  history and reviewed his medical records.  The state court's determination that the <u>Cronic</u>

6  presumption does not apply to these circumstances is not unreasonable.

7      Petitioner further argues that trial counsel's decision to advise him to plead guilty to

8  all charges and special circumstance allegations constitutes a failure to prepare a defense for

9  the guilt phase.  As the Court has explained, however, the record reflects trial counsel's tactic

10  at voir dire of establishing a lesser degree of murder due to impaired mental state, and then

11  choosing to focus on sentencing, rather than guilt and mental state, in the face of

12  overwhelming evidence of guilt.  By advising Petitioner to plead guilty, trial counsel

13  successfully limited the issues for trial and sought to exclude potentially damaging evidence,

14  such as the Szymkiewicz letters, Petitioner's efforts to dispose of evidence, and photographs

15  and other evidence describing details of the murder.

16      In <u>Florida v. Nixon</u>, the Supreme Court held that the <u>Cronic</u> presumption of prejudice

17  did not apply to trial counsel's concession of guilt in the guilt phase of a capital trial.

18      Although such a concession in a run-of-the-mine trial might present a
    closer question, the gravity of the potential sentence in a capital trial
19      and the proceeding's two-phase structure vitally affect counsel's
    strategic calculus.  Attorneys representing capital defendants face
20      daunting challenges in developing trial strategies, not least because the
    defendant's guilt is often clear.  Prosecutors are more likely to seek
21      the death penalty, and to refuse to accept a plea to a life sentence, when
    the evidence is overwhelming and the crime heinous.  In such cases,
22      "avoiding execution [may be] the best and only realistic result
    possible."  . . .
23
    Counsel therefore may reasonably decide to focus on the trial's
24      penalty phase, at which time counsel's mission is to persuade the trier
    that his client's life should be spared.  Unable to negotiate a guilty plea
25      in exchange for a life sentence, defense counsel must strive at the guilt
    phase to avoid a counterproductive course.
26

27  543 U.S. at 191-92.  The <u>Cronic</u> presumption of prejudice similarly does not apply here.  The

28  record does not suggest that Petitioner's pre-trial counsel or replacement trial counsel failed

to prepare a defense or lacked an identifiable strategy, or otherwise abandoned all meaningful

adversarial testing.  See United States. v. Thomas, 417 F.3d 1053, 1058-59 (9th Cir. 2005)

(faced with overwhelming evidence of guilt, counsel's concession, even without defendant's

consultation or consent, was not presumptively prejudicial).  Respondent's motion for

summary judgment is therefore granted as to Claim Two.

## C.    Post-Conviction Counsel

In Claim Three, Petitioner contends that his appointed appellate and state habeas

counsel provided ineffective assistance by failing to preserve evidence, investigate relevant

issues, adequately consult with Petitioner, adequately research issues, and present all issues

of which they were aware to the California Supreme Court.  Am. Pet., ¶¶ 459-466.  The state

supreme court denied this claim without reasoned opinion.  State Rec. 46.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal

defendant the effective assistance of counsel on his first appeal as of right.  See Evitts v.

Lucey, 469 U.S. 387, 393-94 (1985).  Claims of ineffective assistance of appellate counsel

are reviewed according to the Strickland standard.  Miller v. Keeney, 882 F.2d 1428, 1433

(9th Cir. 1989).  Petitioner must show that counsel's advice fell below an objective standard

of reasonableness, and that there is a reasonable probability that, but for counsel's

unprofessional errors, Petitioner would have prevailed on appeal.  Id. at 1434.  Appellate

counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the

defendant.  See Jones v. Barnes, 463 U.S. 745, 753-54 (1983).  Petitioner has not

demonstrated what evidence appellate counsel failed to preserve and how that prejudiced the

outcome of his appeal, nor has he identified which issues were inadequately researched or

presented on direct appeal.  The state court's denial of habeas relief for ineffective assistance

of appellate counsel was thus reasonable.

Furthermore, the Supreme Court has held that there is no federal constitutional right to

counsel for capital prisoners in state collateral review proceedings.  Murray v. Giarratano,

492 U.S. 1 (1989).  Thus, there is no claim for ineffective assistance of habeas counsel.  See

28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising

2  under section 2254.").  The state court's denial of habeas relief was reasonable, and

3  Respondent is granted summary judgment as to Claim Three.

4  **II.      Challenges to Guilty Plea**

5        In Claims Four through Eight, Petitioner challenges the trial court's acceptance of his

6  guilty plea.  In his Fourth Claim, Petitioner contends that the trial court erroneously denied

7  his post-trial motion to withdraw his guilty plea.  In his Fifth Claim, Petitioner asserts that the

8  trial court erred by accepting only a stipulated factual basis for Petitioner's guilty plea, rather

9  than making a record of facts supporting the plea or admissions.  The California Supreme

10 Court denied both Claims on direct appeal, 16 Cal. 4th at 1252-1255, and on collateral

11 habeas review.

12       Petitioner's Sixth and Seventh Claims--which contend that the trial court erred in

13 accepting Petitioner's plea to the special circumstances of attempted forced oral copulation

14 and torture-murder, respectively--have been subsumed by his ineffective assistance claim,

15 denial of which is discussed in Section I.A.3, <u>supra</u> at 27-28.  In his Eighth Claim, Petitioner

16 contends that the trial court erred by failing to apprise Petitioner at the time of entry of his

17 guilty plea that the prosecution was required to prove the element of intent on the special

18 circumstance of torture.  The Court has considered Claim Eight in the context of Petitioner's

19 ineffective assistance claim, <u>supra</u> at 28-29.

20       **A.      Claim Four: Motion to Withdraw Guilty Plea**

21       Petitioner alleges that he entered his guilty plea through mistake and ignorance as a

22 result of intoxication from medications and jail-made wine.  Due process requires that a

23 guilty plea be both knowing and voluntary because it constitutes the waiver of three

24 constitutional rights: the privilege against self-incrimination, the right to a jury trial, and the

25 right to confront one's accusers.  <u>See</u> <u>Boykin v. Alabama</u>, 395 U.S. 238, 243 (1969).  A trial

26 court may not accept a defendant's guilty plea without creating a record affirmatively

27 showing that the plea was knowing and voluntary: a silent record is invalid.  <u>Id.</u> at 242.

28 However, a state court need not enumerate all the rights a defendant waives when he enters a

1   guilty plea as long as the record indicates that the plea was entered voluntarily and

2   understandingly.  See Rodriguez v. Ricketts, 798 F.2d 1250, 1254 (9th Cir. 1986).  Upon

3   review of the record, the Court is satisfied that the state court's denial of habeas relief is

4   reasonable.

5        On May 23, 1989, Petitioner filed a motion to withdraw plea and admission of the

6   special circumstances.  The trial court held an evidentiary hearing on June 27 and 29, 1989.

7   State Rec. 1 at 955-57.  Petitioner testified that the issue of pleading guilty first arose

8   unexpectedly on March 22, 1989, when his attorneys suggested that he should avoid a guilt

9   trial and move directly to the penalty phase.  State Rec. 29 at 3790, 3798.  Petitioner and two

10  other inmates testified that the night of March 22, 1989 they drank pruno, a crude alcoholic

11  drink that they had been fermenting in their jail cells for a few days.  Fairbank, 16 Cal. 4th at

12  1252.  Petitioner also testified that he was taking medication to help him cope with anxiety

13  and insomnia during the trial.  Petitioner was prescribed Sinequan, an antidepressant with

14  sedative effect, and Ativan, a sedative, by jail medical staff for complaints of insomnia and

15  nervousness.  State Rec. 29 at 3705, 3721.  Dr. Hayward, a county psychologist who treated

16  Petitioner, testified that at the time of prescribing the medication, he and Dr. Hamad, the

17  prescribing physician, discussed the need to balance Petitioner's need for sleep medication

18  with the concern that over-sedation would interfere with his trial.  State Rec. 29 at 3706.  Dr.

19  Hayward saw Petitioner on March 22, 1989, and was satisfied that Petitioner was prescribed

20  the appropriate amount of medication, and did not appear drowsy, confused or irrational.

21  State Rec. 29 at 3709.  The trial court heard oral argument and denied the motion.

22       On direct appeal the California Supreme Court upheld the trial court's denial on the

23  ground that substantial evidence supports the trial court's factual determination that

24  Petitioner was not intoxicated at the time he entered his plea and that his plea was knowing,

25  intelligent and voluntary.  The state supreme court noted that the trial court disbelieved

26  Petitioner's testimony about the extent of his intoxication, particularly that he was so drunk

27  that he was falling out of his chair, and that the trial court emphasized that it had observed

28  Petitioner carefully the morning he changed his plea and observed no signs of intoxication at

1   that time.  Fairbank, 16 Cal. 4th at 1254.  Furthermore, the sheriff's deputies who transported

2   Petitioner to court the morning he changed his plea testified that Petitioner did not appear

3   intoxicated.

4          The trial court record satisfies the Boykin requirement that Petitioner's guilty plea be

5   intelligent and voluntary.  395 U.S. at 242-43.  Before Petitioner entered his guilty plea on

6   March 23, 1989, the trial court asked him a series of questions to determine the voluntariness

7   of his plea and confirm his understanding that he would thereby give up his right to jury trial

8   on the charge of murder and on the special circumstances and special allegation.  State Rec.

9   29 at 2782-2786.  The trial judge asked Petitioner whether he had "consumed any drug,

10  narcotic or alcoholic beverages" in the last twenty-four hours, and Petitioner denied doing so.

11  State Rec. 29 at 2786.  The trial court also made clear to Petitioner that he would be facing

12  the possibility of a death sentence at the penalty phase.  State Rec. 29 at 2788-2792.  Counsel

13  stipulated that there was a factual basis for the entry of the plea and for the admission of the

14  special circumstances and special allegation, without reciting the factual basis on the record.

15  State Rec. 29 at 2792.  The trial court then read each charge in the information individually;

16  Petitioner pled guilty to the charge of murder and admitted as true the special circumstance of

17  murder during attempted commission of forced oral copulation, the special circumstance of

18  murder involving the infliction of torture, and the special allegation of personally using a

19  deadly and dangerous weapon, namely a knife and screwdriver.  State Rec. 29 at 2793-95.

20  Petitioner also signed a declaration concerning his change of plea.  State Rec. 1 at 750.  As

21  the state court's denial of Claim Four is not contrary to nor an unreasonable application of

22  federal law, Respondent's motion for summary judgment is granted as to that claim.

23      **B.      Claim Five: Factual Basis for Guilty Plea**

24          The state supreme court denied Petitioner's claim that the trial court failed to make an

25  adequate record of the facts supporting his guilty plea and special circumstance admissions

26  on the ground that, as a matter of state law, a trial court has no duty to inquire into the factual

27  basis of an unconditional plea.  Fairbank, 16 Cal. 4th at 1245.  The propriety of a guilty plea

28  entered in state court is measured under federal constitutional standards, but not federal

*(left margin, vertical text)* **United States District Court** For the Northern District of California

1    statutory requirements.  United States v. Newman, 912 F.2d 1119, 1123 (9th Cir. 1990)

2    (applying Boykin standard for knowing and voluntary plea).  The Due Process Clause does

3    not require a state court to establish a factual basis for a guilty plea absent special

4    circumstances, such as "a specific protestation of innocence."  Rodriguez v. Ricketts, 777

5    F.2d 527, 528 (9th Cir. 1985).  Petitioner does not cite any federal case that suggests that

6    such special circumstances include a capital case.  Accordingly, the state court's denial of

7    habeas relief on Claim Five is not contrary to clearly established federal law.  Respondent's

8    motion for summary judgment on Claim Five is therefore granted.

9    **III.    Jailhouse Informant**

10         In Claim Nine Petitioner claims that his fellow inmate at the San Francisco County

11   Jail, John Szymkiewicz, acted as a prosecution agent and elicited information from Petitioner

12   about the murder weapon and other physical evidence in violation of Petitioner's right

13   against self-incrimination and right to counsel under Massiah v. United States, 377 U.S. 201,

14   206 (1964).  On October 24 and 27, and December 8, 1987, the trial court conducted an

15   extensive evidentiary hearing on Petitioner's Massiah motion to exclude, at which

16   Szymkiewicz, Detectives Poynter and Dirickson, and two prosecutors testified.  State Rec. 1

17   at 270-72, 274, 310; State Rec. 13, 14, 21.  The trial court found that Petitioner's statements

18   were not deliberately elicited by the law enforcement personnel, and held that there was no

19   Massiah violation.  State Rec. 22.  The California Supreme Court affirmed the trial court's

20   ruling in a reasoned opinion on direct appeal, Fairbank, 16 Cal. 4th at 1246-1249, and

21   summarily denied habeas relief on collateral review.  The evidence presented at the Massiah

22   hearing is summarized in the opinion of the state supreme court, whose factual

23   determinations are presumed to be correct pursuant to 28 U.S.C. § 2254 (e)(1).

24         Once a defendant's Sixth Amendment right to counsel has attached, the government

25   may not deliberately elicit incriminating statements from the defendant outside the presence

26   of counsel.  Massiah v. United States, 377 U.S. 201, 206 (1964).  This prohibition extends to

27   the use of jailhouse informants who relay incriminating statements from a prisoner to the

28   government.  Randolph v. California, 380 F.3d 1133, 1143 (9th Cir. 2004).  Statements made

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    by the defendant to the informant before the informant meets with the prosecution team

2    cannot form the basis of a Massiah violation.  See id. at 1144.

3         Factors relevant to determining whether the government has deliberately elicited

4    incriminating statements through the use of an informant include whether the informant was

5    acting under instructions from the government and was paid for his services, whether the

6    informant was ostensibly no more than a fellow inmate which caused the defendant to trust

7    him and be more likely to make incriminating statements to him, and whether the defendant

8    was in custody and under indictment at the time the informant conversed with him.  See

9    Randolph, 380 F.3d at 1143 (citing United States v. Henry, 447 U.S. 264, 270-271 (1980)).

10   That the government instructs the informant not to ask questions of the defendant does not

11   defeat the motion to exclude if the government makes some effort to stimulate conversations

12   about the crime charged, such as placing the informant in a cell with the defendant.  Id. at

13   1143, 1146-47.  An explicit agreement to compensate the informant is not necessary to a

14   finding that the informant acted as an agent of the state.  Id. at 1144.  It is the likely result of

15   the government's acts, rather than the government's intent or overt acts, that are important in

16   determining whether the informant acted as its agent.  Id.

17        While Petitioner was jailed in San Francisco on the Gemmil crime, he was held in a

18   cell opposite from Szymkiewicz.  State Rec. 14 at 15-16.  Szymkiewicz testified that

19   Petitioner approached him about either establishing an alibi or taking responsibility for the

20   Cheek murder in exchange for $10,000 to $15,000.  Am. Pet., ¶ 567.  Petitioner gave

21   Szymkiewicz written notes with information about the crime.  Id.; State Rec. 14 at 16.  There

22   is no evidence to suggest that Szymkiewicz met with the detectives before obtaining

23   incriminating evidence from Petitioner.  It is undisputed that Szymkiewicz contacted San

24   Francisco police officers on May 13, 1986, about the information he already had about

25   Petitioner's capital crime.  Am. Opp. at 38; Am. Pet., ¶ 573 and Ex. 216.  The officers alerted

26   San Mateo County Detectives Dirickson and Poynter, who interviewed Szymkiewicz the next

27   day.  Am. Opp. at 38.  Dirickson testified that he was aware that Szymkiewicz wanted to

28   obtain a reduced sentence on his own robbery charges.  Dirickson asked for Petitioner's

1    notes, but Szymkiewicz would not produce them to law enforcement until he received a deal.

2    State Rec. 14 at 38.  Dirickson had two or three more meetings with Szymkiewicz before

3    Petitioner's attorneys discovered, on May 23, 1986, that the district attorney was obtaining

4    information about Petitioner from an informant.  State Rec. 14 at 38-39; State Rec. 6 at 9-10.

5            The state supreme court concluded that Symkiewicz was not a government agent:

6            Detective Poynter believed that Szymkiewicz would continue to try to obtain
             information from defendant, and a deputy district attorney intervened to
7            prevent the sheriff's department from moving defendant away from
             Szymkiewicz.  But the police made no promises to Szymkiewicz about a
8            possible deal, they did not direct him to obtain more information, and they did
             not suggest that obtaining more information would benefit him. The trial court
9            specifically found that Szymkiewicz "continued to talk to the defendant on his
             [own] initiative," and "law enforcement ... made deliberate and direct efforts
10           and attempts to do everything they could to dispel the fact that they would be
             able to be of any help [to Szymkiewicz ] and that there was any implied
11           promise of leniency."

12   Fairbank, 16 Cal. 4th at 1248-49.

13           Petitioner challenges the state court's finding that the detectives did not encourage

14   Szymkiewicz to further question Petitioner, and thus its conclusion that Symkiewicz was not

15   acting as a government agent.  He offers a post-conviction declaration by Szymkiewicz,

16   dated May 18, 2000, stating that the detectives led him to understand that they would do

17   whatever possible to help him if he cooperated with them, and told him that they were

18   looking for a murder weapon, which Szymkiewicz understood to be a request to question

19   Petitioner about the weapon.  Am. Pet., Ex. 267, ¶ 7.  Szymkiewicz states that he, in fact,

20   asked Petitioner about the weapon and Petitioner responded by writing a note that states that

21   the murder weapon was a barbeque fork and is in the possession of his lawyers.  Id.

22           The implication of Szymkiewicz' declaration testimony–that the detectives asked him

23   to prod Petitioner for more information about the murder weapon–contradicts Szymkiewicz'

24   October 1986 testimony that from the time he first met with Detectives Poynter and

25   Dirickson, they did not suggest that he ask Petitioner for more information.  State Rec. 14 at

26   22.  Consistent with Szymkiewicz' earlier testimony, Detective Dirickson testified that

27   neither he nor Detective Poynter ever suggested that Szymkiewicz obtain more information

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    from Petitioner because the inmates had already exchanged most of the information.  State

2    Rec. 14 at 37, 42-43.

3         Although the evidence shows that the detectives and prosecution knew that Petitioner

4    was continuing to communicate with Szymkiewicz, there is no reliable evidence that

5    Szymkiewicz was acting on instructions from the government, rather than on his own accord.

6    See Brooks v. Kincheloe, 848 F.2d 940, 945 (9th Cir. 1988) (no Massiah violation where

7    informant was not instructed to ask questions and was not promised any deals or rewards for

8    information he might provide).  The informant's own subjective belief that he might receive

9    lenient treatment in exchange for information does not amount to a promise or deal from the

10   prosecution.  See Hovey v. Ayers, 458 F.3d 892, 917 (9th Cir. 2006).  Detective Poynter

11   testified that he had told Szymkiewicz that neither his department nor the San Mateo County

12   District Attorney's office had any power to compel the San Francisco District Attorney's

13   office to make any deals, and it was not until September 1986 that Szymkiewicz was given a

14   reduction in sentence from 15 to 10 years.  State Rec. 13 at 332-33.  Thus, the state court's

15   finding that the government did not "stimulate" Szymkiewicz to converse with Petitioner

16   about the crime is not unreasonable.

17        Petitioner's reliance on Randolph, 380 F.3d 1133, is unavailing.  In Randolph the

18   Ninth Circuit held for the first time that "a jailhouse informant can be considered a

19   government agent if there is no express agreement between the informant and the

20   government that the informant will be compensated for his services" provided there is

21   "sufficient evidence that the State made a conscious decision to obtain [the informant's]

22   cooperation and that [the informant] consciously decided to provide that cooperation."  Id. at

23   1144.  The evidence of these conscious decisions was the undisputed testimony that the

24   informant hoped to receive leniency and, acting on that hope, cooperated with the state and

25   the state agents' knowledge that the informant hoped to receive leniency.  Id.

26        Assuming that the record here supports a similar finding, that is, that Szymkiewicz

27   cooperated with the expectation of compensation and the detectives were aware of that

28   expectation, the state court's determination that Symkiewicz was not acting as a government

1    agent was not contrary to nor an unreasonable application of federal law.  Randolph was not

2    an AEDPA case and, most importantly, it was decided *after* the California Supreme Court

3    rejected Petitioner's Massiah argument.  Since the Randolph court did not rely on any

4    Supreme Court decision holding that a jailhouse informant may act as a government agent

5    without an express compensation agreement (because there is none), and since Randolph was

6    the first time the Ninth Circuit had considered, let alone held, that a jailhouse informant

7    could be considered a government agent for Massiah purposes under such circumstances, the

8    state supreme court's decision was not contrary to nor an unreasonable application of federal

9    law; in other words, at the time of the California Supreme Court's decision the governing law

10   did not dictate a finding of a Massiah violation.

11         Petitioner also challenges the trial court's refusal to provide Petitioner with

12   Szymkiewicz' central file despite a 1983 memorandum indicating that Szymkiewicz had

13   provided information to the state about a fatal stabbing by a prison gang while he was in state

14   custody.  Am. Pet. ¶ 580.  See also State Rec. 34 at 39; Opp., Ex. 300, ¶¶ 3-5.  The

15   unavailability of the file did not prejudice Petitioner because even if Szymkiewicz had

16   informed about prison gang activity, that conduct does not establish that he was acting as a

17   government agent in this case.  See United States v. Brink, 39 F.3d 419, 424 (3d Cir. 1994)

18   ("An inmate who voluntarily furnishes information without instruction from the government

19   is not a government agent, even if the informant had been an agent in the past.") (citing

20   United States v. Van Scoy, 654 F.2d 257, 260 (3d Cir. 1981)).  Moreover, as the California

21   Supreme Court noted,  there is nothing in the record that suggests the detectives were aware

22   of Szymkiewicz' previous informant activity.

23         In any event, even if the state court's determination of no Massiah violation was

24   unreasonably incorrect, Petitioner has not shown that the error had a "substantial and

25   injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  In

26   Brecht, the Supreme Court found harmless error where the prosecution's impermissible

27   references to the petitioner's post-Miranda silence were infrequent; the evidence of guilt was

28   weighty, if not overwhelming; and other circumstantial evidence pointed to the petitioner's

United States District Court
For the Northern District of California

guilt.  507 U.S. at 639.  Here, most of the jailhouse notes that Szymkiewicz provided to the detectives were not admitted as a result of Petitioner's guilty plea.  During the penalty phase Szymkiewicz' testimony was admitted as evidence of Petitioner's efforts to intimidate witnesses, not as evidence of Petitioner's guilt.  State Rec. 29 at 3024.  Although Petitioner emphasizes that the prosecutor enlarged Petitioner's jailhouse notes and referred to them during his guilt phase opening statement, the issue of guilt was not before the jury, whose brief exposure to the enlarged images of Petitioner's notes was minimized by the extensive forensic and testimonial evidence presented during the penalty phase.

With respect to the two notes threatening Kitchell and Stracener that were admitted during the penalty phase (and accepting Petitioner's contention that Szymkiewicz obtained them after his initial meeting with the detectives), the trial court admitted those notes as relevant to the aggravating circumstance of soliciting another to harm witnesses and threatening violence against them for providing assistance to law enforcement, a separate offense for which Petitioner had not yet been charged and as to which the right to counsel had not yet attached.  State Rec. 29 at 2891.  See U.S. v. Danielson, 325 F.3d 1054, 1066 (9th Cir. 2003) (holding that as right to counsel is offense-specific, using informant to obtain statements about separate offenses of jury tampering and suborning perjury did not violate Sixth Amendment rights) (citing Texas v. Cobb, 532 U.S. 162, 167-73 (2001)).  Thus, even assuming that Szymkiewicz was acting as a state agent when he obtained those two notes, there was no Massiah violation.  And, even if the witness threats are construed as the same offense as the murder charge, such that Petitioner's right to counsel attached to his statements about harming the witnesses within the purview of Massiah, any error in admitting those notes is harmless in light of Kitchell's and Stracener's own testimony that Petitioner had threatened them.

Petitioner nonetheless contends that he was prejudiced by the alleged Massiah violation because the prosecution obtained information about the murder weapon, trunk and clothing as a result of Petitioner's communications with Szymkiewicz and such evidence was crucial to the prosecution's case.  Am. Pet., ¶ 584.  As the Court previously discussed in the

United States District Court
For the Northern District of California

1  context of Petitioner's ineffective assistance of counsel claim, such evidence served merely

2  to corroborate the overwhelming evidence of guilt that the prosecution had obtained

3  independent of Szymkiewicz, including the victim's blood found on the mattress and carpet

4  in Petitioner's apartment and on the red bodysuit.  None of the physical evidence recovered

5  through the informant's testimony had sufficient blood samples to identify definitively with

6  the murder victim, and the prosecutor did not even argue that the knife in evidence was

7  actually one of the murder weapons.  State Rec. 29 at 3597.

8      As Petitioner's allegations do not establish the right to relief, his request for an

9  evidentiary hearing is denied.  Furthermore, Petitioner has not demonstrated that prior

10  counsel fell below an objective standard of reasonableness in litigating the Massiah issues at

11  trial and on appeal to support his related ineffective assistance claim.   Am. Pet., ¶ 589.

12  Accordingly, Petitioner has not met his burden in opposing Respondent's motion for

13  summary judgment, which is hereby granted on Petitioner's Ninth Claim for relief.

14  **IV.    Prosecutorial Misconduct Claims**

15      **A.    Closing Argument**

16      In Claim Eleven Petitioner contends that the prosecutor committed misconduct by

17  making incorrect, inflammatory and prejudicial statements during his penalty phase closing

18  argument.  On collateral review the state supreme court summarily denied this claim both on

19  the merits and as procedurally barred because it was not raised on appeal.  In the absence of a

20  reasoned opinion by a state court, the Court conducts its own independent review of the

21  record.  Himes, 336 F.3d at 853.

22      The standard for evaluating prosecutorial misconduct during trial proceedings is

23  whether the prosecutor's questions and/or arguments were so significant to have rendered the

24  trial fundamentally unfair.  Donnelly v. DeChristoforo, 416 U.S. 637, 647-48 (1974).  The

25  conduct must have "so infected the trial process with unfairness as to make the resulting

26  conviction a denial of due process."  Darden v. Wainwright 477 U.S. 168, 181 (1986)

27  (quoting Donnelly, 416 U.S. at 643).  "'Improper argument does not, per se, violate a

28  defendant's constitutional rights.'"  Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996)

United States District Court

For the Northern District of California

1   (citing Jeffries v. Blodgett, 5 F.3d at 1191).   In evaluating habeas challenges to comments by

2   the prosecution, the Court considers  "(1) whether the prosecutor's comments manipulated or

3   misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the

4   weight of the evidence against the accused."  Tak Sun Tan v. Runnels, 413 F.3d 1101, 1115

5   (9th Cir. 2005) (reversing grant of habeas writ on the ground that prosecutor's reference to

6   victim's life struggles did not amount to denial of due process under Darden).

7           Petitioner identifies four closing argument statements in support of his prosecutorial

8   misconduct claim.  First, he complains that the prosecutor argued that the jury would decide

9   "which factors [in Penal Code § 190.3] you consider aggravating, which factors you consider

10  mitigating."  State Rec. 29 at 3588.  The prosecutor made this statement in the context of

11  arguing that the jury has to weigh the evidence and that the aggravating factors outweighed

12  the mitigating factors.  Taken in context, this statement did not suggest that the jurors should

13  disregard any instructions from the trial court or otherwise misstate the evidence or the law.

14  Moreover, the trial court gave several clarifying instructions.  The court initially instructed

15  the jurors before the prosecutor even began his closing argument that "the statements of the

16  attorneys are not evidence in this case, but, . . . this is a good time for you to listen to what

17  the various positions are in the matter."  State Rec. 29 at 3583.  Following closing arguments,

18  the trial judge instructed the jury to follow the law as the court instructed, even if it conflicted

19  with the attorneys' statements, and detailed for the jury the factors to consider in the penalty

20  phase.  State Rec. 29 at 3666, 3673-75.  Petitioner has not shown that this statement rendered

21  his trial fundamentally unfair.  See Jeffries, 5 F.3d at 1192 (holding that the prosecutor's

22  passing reference to the defendant's right to appeal did not indicate to the jury that it was

23  relieved of its responsibility for determining the appropriateness of the death penalty).

24          Second, Petitioner challenges as erroneous the prosecutor's statement that "[t]he fact

25  that [Petitioner] is a drug addict and has been for many years really doesn't fit under . . .

26  factor [(d) of California Penal Code § 190.3]."  State Rec. 29 at 3602.  Petitioner disputes the

27  prosecutor's contention that Petitioner's cocaine addiction, and Dr. Clark's testimony of

28  cocaine psychosis, could not be considered as evidence of "whether or not the offense was

committed while the defendant was under the influence of extreme, mental or emotional disturbance." Cal. Penal Code § 190.3(d). This argument did not prevent the jury from considering Petitioner's cocaine addiction as a mitigating factor. Later in closing argument the prosecutor acknowledged that Petitioner would argue that he was intoxicated, and disputed at length whether Petitioner was impaired within the meaning of factor (h), that is, whether at the time of the offense the defendant's capacity to appreciate the criminality of his conduct was impaired as a result of mental disease or defect or intoxication. State Rec. 29 at 3605-09. Defense counsel did, in fact, argue that although cocaine use was not a defense to the murder, Petitioner's drug addiction was a factor in Petitioner's behavior and the jury could consider it as a mitigating circumstance under factor (h). State Rec. 29 at 3651-60. The jury also would have been able to consider drug addiction under factor (k) pursuant to the trial court's instructions that they could consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." State Rec. 29 at 3674-75. See Cal. Penal Code § 190.3(h) and (k).

Third, Petitioner challenges the prosecutor's statement that "[w]e have what appears to be a totally, useless and worthless human being without one good thing in his life that you've been told about. And you know you would have heard it if it were there." State Rec. 29 at 3610-11. Petitioner offers no argument to show how this statement resulted in denial of due process. Moreover, the trial court had already explained to the jury that the lawyers' statements are not evidence, and–contrary to the prosecutor's argument--the jury had heard testimony from Petitioner's past girlfriends that he was a calm, decent person when he was not on drugs, a fact that defense counsel emphasized in closing argument. State Rec. 29 at 3654. See Hovey v. Ayers, 458 F.3d at 924 (holding that the prosecutor's misstatement during closing did not amount to a due process violation where the jury was properly instructed and the evidence against the defendant was considerable).

Fourth, Petitioner challenges the prosecutor's statement that "as you all know, psychiatric testimony, psychological testimony is largely conjecture. Maybe they're right in this case. Maybe they're not." State Rec. 29 at 3626. The prosecutor's suggestion that

psychological testimony is not reliable is not a misstatement of law rendering the trial fundamentally unfair.  The trial court instructed the jurors that they are "not bound to accept an expert opinion as conclusive, but should give to it the weight to which you find it to be entitled," instructing them to consider the qualifications and credibility of the expert.  State Rec. 29 at 3672.  The prosecutor's attack on the credibility of defense experts lay within the realm of closing argument, and did not amount to misconduct.

The state court's determination that none of the prosecutor's statements during closing argument rose to the level of a due process violation is not contrary to nor an unreasonable application of federal law.  As Petitioner's allegations do not establish a colorable claim for relief, his request for an evidentiary hearing on his claim of prosecutorial misconduct is denied.  Respondent's motion for summary judgment on Claim Eleven is granted.

**B.      Evidence of Racial Slur**

In Claim Twelve Petitioner contends that the prosecution violated his due process rights by eliciting testimony about a racial slur made by Petitioner after the trial court had sustained defense counsel's objection.

As part of his evaluation of Petitioner, Dr. Fricke administered an intelligence test known as the Wechler Adult Intelligence Scale–Revised.  Am. Pet., ¶ 614.  The test asked Petitioner a series of questions.  Dr. Fricke's notes reflected that in response to a question to identify Martin Luther King, Jr., Petitioner answered: "a dead nigger - don't like black people."  Id.  The prosecutor had Dr. Fricke's notes.

During cross-examination the prosecutor asked Dr. Fricke whether he got "any sense" from the tests he had administered to Petitioner "about his attitudes, his racial attitudes?"  State Rec. 29 at 3546.  Defense counsel objected to the prosecutor's questions about Petitioner's "racial attitudes" as irrelevant and the trial court sustained the objection.  State Rec. 29 at 3546-47.  The prosecutor immediately proceeded to cross-examine Dr. Fricke about the questions he had asked Petitioner as part of the intelligence test.  The prosecutor elicited that Petitioner did not know the answer to a question about what temperature water boils; he did not know how yeast causes dough to rise; he did not know who was President

G:\CRBALL\1998\1027\Order re Summary Judgment.wpd 55

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   during the civil war; and he did not know the capital of Italy.  State Rec. 29 at 3547-49.  The

2   prosecutor then engaged in the following colloquy with Dr. Fricke:

3       Q       What is question 17 about a King?

4       A       "Who Was Martin Luther King?"

5       Q       Did he answer that one?

6       A       Yes.

7       Q       What did he say on that one?

8       A       "A dead nigger, don't like black people."

9   State Rec. 29 at 3549.  Although this questioning occurred just moments after the trial court

10  had sustained an objection to any inquiry as to Petitioner's racial attitudes, defense counsel

11  did not object. The prosecutor continued with his cross-examination; he asked about a Labor

12  Day question and a question about what direction you would travel if you went from Chicago

13  to Panama, and then moved on to inquiring about a different test administered by Dr. Fricke.

14  Id.  Petitioner's racial comment was never again referred to in the trial.

15          It is beyond peradventure that the response to the Martin Luther King question would

16  have been negatively received by the jurors: Petitioner's response revealed repugnant animus

17  toward blacks that nearly all jurors, including the African-American foreperson, would find

18  loathesome.  It is equally apparent that Petitioner's attitude toward blacks was irrelevant to

19  the penalty phase: Petitioner and all of his victims were white and there is nothing in the

20  record to suggest that racial animus played any role in any of his crimes.

21          The prosecutor nonetheless argued to the trial court that his question (and Petitioner's

22  answer) was relevant and admissible because it showed that Petitioner was not taking the

23  intelligence test seriously.  The State's argument would have more force if no objection had

24  been raised earlier; however, just moments before the prosecutor elicited the offending

25  statement the trial judge ruled that the prosecution could not question Dr. Fricke about

26  Petitioner's racial attitudes.  The prosecution's inquiry as to Petitioner's precise response to

27  the Martin Luther King question revealed Petitioner's racial attitudes–exactly the line of

28  inquiry forbidden by the trial court.  If the prosecutor believed in good faith that the answer

1  was nonetheless so relevant that its probative value outweighed its obvious prejudicial value,

2  then he should have made an offer of proof to the trial court outside the jury's presence as to

3  why the court should allow the question and answer.  He did not.

4      As noted above, however, defense counsel did not object at trial to the prosecutor's

5  question; instead, counsel raised this issue of prosecutorial misconduct on Petitioner's motion

6  for new trial, which the trial court denied.  State Rec. 29 at 4006.  The state supreme court

7  rejected this prosecutorial misconduct challenge on direct appeal for failure to object at trial:

> By interposing an objection, defendant probably could have prevented the jury
> from hearing defendant's answer to the test question about Martin Luther King.
> The record indicates that the prosecutor only knew a key word from each
> question, not the entire question. Therefore, the prosecutor asked, "What is
> question 17 about a king?" Dr. Fricke responded, "'Who was Martin Luther
> King?,'" and the prosecutor asked, "Did he answer that one?" Dr. Fricke
> answered, "Yes," and the prosecutor asked, "What did he say on that one?" Dr.
> Fricke then gave the answer, "A dead nigger, don't like Black people."
>
> As soon the prosecutor mentioned "question 17 about a king," defense counsel,
> who presumably had access to Dr. Fricke's records and knew defendant's
> answers to each of the test questions, could have predicted where the
> questioning would lead and could have objected. Because the prosecutor had to
> ask Dr. Fricke two more questions before eliciting defendant's racist comment,
> defense counsel had ample time in which to interrupt the line of inquiry.
> Instead, defense counsel remained silent. In addition, defense counsel could
> have objected after Dr. Fricke reported defendant's racist comment, in which
> case the court could have admonished the jury not to take defendant's racial
> attitudes into account. An admonishment of that kind would have negated any
> possibility of prejudice to defendant.

19  Fairbank, 16 Cal. 4th at 1251-52.

20      The Court does not agree with the state court's finding that defense counsel could

21  have objected and prevented the jury from hearing the offending remark.  First, the court

22  does not agree that the record demonstrates that defense counsel could have predicted where

23  the questioning would lead.  The prosecutor's inquiry about other questions on the

24  intelligence test just prior to the King question had asked about the nature of each

25  intelligence test question and whether Petitioner had answered correctly; the prosecutor had

26  not asked exactly how Petitioner had answered any of the questions.  State Rec. 29 at 3547-

27  49.  Thus, reasonable defense counsel would not have predicted that the prosecutor intended

28  to ask *how* Petitioner responded to the King question, as opposed to whether Petitioner knew

United States District Court

For the Northern District of California

1  the answer, as the prosecutor had asked in his prior questions.  This is especially so given

2  that just moments earlier the trial judge had barred the prosecutor from inquiring into

3  Petitioner's racial attitudes.  A defense counsel who assumes that the prosecutor is acting in

4  good faith would not predict that the prosecutor would ask for an answer that directly

5  violates the trial judge's order from a moment earlier.

6       The first time, then, that defense counsel should have realized that the prosecutor was

7  attempting to elicit the offending statement in violation of the trial judge's order was when

8  the prosecutor asked Dr. Fricke for Petitioner's response to the Martin Luther King question.

9  The transcript does not reveal how quickly Dr. Fricke responded to the question and thus

10  whether defense counsel had a realistic opportunity to object.  Assuming, however, that

11  defense counsel had that opportunity, the prosecution's question presented him with a

12  Hobson's choice.  He could object and leave the jury to speculate as to the answer that he

13  succeeded in keeping from the jury, speculation that was likely to be unfavorable to his client

14  given that moments earlier the trial judge had sustained his objection to questions about

15  Petitioner's racial attitudes, or he could remain silent and hope that the jury was not paying

16  close attention.

17       The Court also does not agree that defense counsel could have objected after Dr.

18  Fricke testified as to Petitioner's racial slur.  Once the prosecutor had rung the bell the trial

19  court could not unring it.  The jury heard the statement and any instruction to disregard the

20  response would serve merely to highlight the slur.  See Aguilar v. Alexander, 125 F.3d 815,

21  820 (9th Cir. 1997) (holding that there are certain extreme circumstances under which a

22  curative instruction would be insufficient to neutralize otherwise prejudicial evidence).

23       The relevant issue, however, is not whether this Court agrees with the state court's

24  finding; this Court is bound by that finding unless it "was based on an unreasonable

25  determination of the facts in light of the evidence presented in the State court proceeding."

26  28 U.S.C. § 2254(d).  The Court need not resolve this difficult question because, regardless

27  of the outcome, the Court finds that the prosecution's elicitation of the remark did not

28  prejudice the outcome of Petitioner's penalty phase trial.

United States District Court
For the Northern District of California

1    To establish prejudice in the penalty phase of a capital case a petitioner must

2 demonstrate that there is "a reasonable probability" that, but for the error or errors, the result

3 of the proceeding would have been different," that is, that the jury "would have concluded

4 that the balance of aggravating and mitigating circumstances did not warrant death." Boyde

5 v. Brown, 404 F.3d 1159, 1180 (9th Cir. 2005) (internal quotation marks and citation

6 omitted).  A reasonable probability is one "'sufficient to undermine confidence in the

7 outcome,' "but is "less than the preponderance more-likely-than-not standard." Summerlin,

8 427 F.3d at 640, 643 (quoting and citing Strickland, 466 U.S. at 693-94).

9    In an attempt to demonstrate prejudice, Petitioner suggests that the jury foreman, an

10 African-American, was visibly disaffected and angry after the prosecution elicited the racial

11 slur during Dr. Fricke's testimony.  Am. Pet., ¶ 617.  Petitioner explains that during the trial

12 he and the foreman exchanged friendly glances, but that after Dr. Fricke testified he was

13 never again able to make eye contact with the foreman.  State Rec. 1 at 984 (Petitioner's

14 declaration in support of motion for new trial).  Petitioner also offers the declaration of the

15 foreman, who states that when Dr. Fricke testified about Petitioner's derogatory remark

16 everyone looked at him, as the only African-American man in the courtroom, for a reaction.

17 Am. Pet., Ex. 238, ¶ 7.  The foreman considered this testimony as just another piece of

18 evidence.  Id.

19    There is not a reasonable probability that the brief testimony as to Petitioner's

20 response to the Martin Luther King question affected the jury's verdict.  The remark was

21 never mentioned again during the trial and the prosecutor did not offer any argument that

22 even remotely suggested that Petitioner's racial beliefs weighed in favor of imposition of a

23 death sentence.  And race was not a factor in any of the crimes discussed during the penalty

24 phase.  In contrast to the silence in the record as to the racial slur, there was overwhelming

25 evidence of aggravating factors to support the jury's recommendation of a death sentence.

26 The prosecutor's closing argument powerfully recounted the chilling circumstances of the

27 crime of conviction and Petitioner's other crimes.  To hold that the prosecutor's elicitation of

28

United States District Court

For the Northern District of California

1  the racial slur prejudiced Petitioner in these circumstances would mean that admission of

2  such a statement is prejudice per se.  The Court cannot agree with such a holding.

3       Petitioner contends that he has not had the opportunity to conduct full discovery to

4  develop evidence of prejudice on this prosecutorial misconduct claim.  The issue of

5  prejudice, however, can be resolved with reference to the state record, such that neither

6  discovery nor an evidentiary hearing is necessary.  Prejudice from a single statement that was

7  never argued or even again mentioned cannot be shown in light of the overwhelming

8  evidence in aggravation.  No amount of discovery will change this result.  Therefore, while

9  the Court believes that the prosecutor engaged in misconduct in asking the question that

10  elicited the racial slur, this claim fails because Petitioner cannot demonstrate the required

11  prejudice.  Respondent's motion for summary judgment is therefore granted on Claim

12  Twelve.

13  **V.      Trial Court Errors**

14       In Claims Ten, Thirteen, Fourteen, Fifteen and Sixteen, Petitioner alleges that the trial

15  court made numerous errors, discussed below.  Applying the <u>Brecht</u> standard for habeas

16  review, the Court concludes that Petitioner has failed to demonstrate that the alleged trial

17  errors had a substantial and injurious effect or influence in determining the jury's verdict, and

18  that the alleged trial errors are harmless.  <u>See</u> <u>Fry v. Pliler</u>, 127 S.Ct. 2321, 2328 (2007)

19  (citing <u>Brecht</u>, 507 U.S. at 631), <u>reh'g denied</u>, 2007 WL 2349930 (U.S., Aug. 20, 2007).

20       **A.      Admission of Weapon**

21       Petitioner contends in Claim Ten that the trial court erred by admitting a barbeque

22  fork as a possible weapon used in the murder.  The state's forensic pathologist, Dr. Benson,

23  testified that a barbeque fork he purchased in a hardware store was consistent with two of

24  Cheek's wounds, but acknowledged that other instruments could have made the wounds.

25  State Rec. 29 at 2943-46.  The admission of evidence is not subject to federal habeas review

26  unless a specific constitutional guarantee is violated or the error is of such magnitude that the

27  result is a denial of the fundamentally fair trial guaranteed by due process.  <u>See</u> <u>Estelle v.</u>

28  <u>McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999).

Assuming the trial court erred by admitting the fork without adequate foundation, Petitioner has not shown that the admission of this evidence had substantial and injurious effect on the jury's verdict, as Dr. Benson did not purport to identify the exhibit as the murder weapon, or even opine beyond the mere possibility that the wounds were caused by it.  See Brecht, 507 U.S. at 637.

Petitioner further contends that trial counsel failed to object to the presentation of the fork at trial.  Am. Pet., ¶ 597.  The record indicates, however, that on their motion to exclude evidence, trial counsel objected to admission of Petitioner's jailhouse notes to Szymkiewicz, including the letter referring to using a barbeque fork.  State Rec. 29 at 2836.  To counter the prosecution's contention that the letters were necessary to determine the circumstances of the crime, defense counsel acknowledged that Dr. Benson would be able to testify to the nature of the wounds, rendering the letters cumulative.  State Rec. 29 at 2836-38.  Having argued in pretrial motions about the admissibility of evidence concerning the circumstances of the crime, it would not have been reasonable for defense counsel to object to Dr. Benson's testimony and exhibit at trial.  Petitioner has therefore failed to demonstrate that trial counsel's performance was deficient to support his related ineffective assistance claim.

A review of the record reveals that the state supreme court's denial of this claim was not objectively unreasonable.  Respondent's motion for summary judgment is therefore granted on Claim Ten.

**B.	Admission of Gemmil Crime**

In Claim Thirteen, Petitioner contends that the trial court committed prejudicial error by admitting evidence of the Gemmil crime.  The state supreme court denied this claim on the merits.  State Rec. 46.

The trial court ruled on the admissibility of the prior crime after hearing pretrial motions on February 21 and 22, 1989, finding "very distinctive similarities between the two offenses."  See State Rec. 29 at 406-410, 522-25.  The trial court held that the evidence of the Gemmil assault was relevant to establish motive and intent for forcible oral copulation, but not for rape, and also found that it was relevant to establish motive and intent to kill Ms.

1   Cheek, "since Gemmil had escaped and the defendant was aware of the consequences of that

2   having been arrested and charged with that offense against her."  State Rec. 29 at 523-24.

3   The trial court also determined that the probative value of the evidence outweighed any

4   prejudice.  State Rec. 29 at 524.

5          Petitioner has not demonstrated that admission of the Gemmil crime was arbitrarily or

6   fundamentally unfair.  See Colley v. Sumner, 784 F.2d 984, 990 (9th Cir.) (denying habeas

7   relief for admission of evidence of prior similar crime).  In Colley, the petitioner contended

8   that a former victim's testimony alleging his commission of a prior sexual assault was

9   irrelevant and highly prejudicial.  The Court of Appeals, however, held that "the testimony

10  was relevant to prove both intent and identity-issues that Colley raised by his 'not guilty'

11  plea."  There, the victim's testimony was especially probative of identity because it

12  suggested a unique modus operandi: "Colley took both women out driving, assaulted them in

13  roughly the same place within several days of each other, commenced his attack by choking

14  them, and expressed remorse, distress, and confusion during or after the act."  784 F.2d at

15  990.

16         Here, the evidence suggests that Petitioner lured the victims, both of whom were

17  strangers, to his apartment at night, struck them in the face and chest, forced both women to

18  disrobe and wear the red lingerie, and forced them both to listen to the sexually explicit

19  phone recordings and to orally copulate him though he was unable to ejaculate.  Even

20  Petitioner's own expert recognized "striking similarities" between the Gemmil assault and

21  the Cheek murder.  Am. Pet., Ex. 273, ¶ 92.  Given the facts of both crimes, the state court

22  reasonably deemed evidence of the prior crime to be relevant; its admission did not deprive

23  Petitioner of a fair trial.  Respondent's motion for summary judgment on Claim Thirteen is

24  therefore granted.

25         **C.     Informant Testimony**

26         Petitioner contends in Claim Fourteen that the trial court erred by failing to instruct

27  the jury to consider with caution Szymkiewicz' testimony about Petitioner's attempt to

28  prevent Ms. Kitchell and Ms. Stracener from testifying at his trial; Petitioner argues that the

1    court should have instructed the jury about the inherent unreliability of a jailhouse

2    informant's testimony.  Am. Pet., ¶ 644 (citing CALJIC 3.20).[1]  On habeas review, the state

3    supreme court denied this claim on the merits.  State Rec. 46.

4          A state trial court's refusal to give an instruction does not alone raise a ground

5    cognizable in a federal habeas corpus proceedings.  See Dunckhurst v. Deeds, 859 F.2d 110,

6    114 (9th Cir. 1988) (citation omitted).  To warrant habeas relief, the petitioner must show

7    that the error "'by itself so infected the entire trial that the resulting conviction violates due

8    process.'"  Estelle, 502 U.S at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  In

9    this regard, a habeas petitioner whose claim involves a failure to give a particular instruction

10   bears an especially heavy burden, for an omission or an incomplete instruction is less likely

11   than a misstatement of the law to be prejudicial.  Henderson v. Kibbe, 431 U.S. 145, 155

12   (1977).  The Court must evaluate the omission in the context of the entire record, including

13   the other jury instructions, the testimony and evidence, and the arguments of counsel.

14   Henderson, 431 U.S. at 152; Cupp, 414 U.S. at 146- 47;  Duckett v. Godinez, 67 F.3d 734,

15   745 (9th Cir. 1995).

16         Applying this standard, the Court concludes that the state trial court's failure to give a

17   cautionary instruction regarding the jailhouse informant's testimony did not violate

18   Petitioner's due process rights.  First, the trial court instructed the jury extensively on how to

19   judge the testimony of witnesses.  State Rec. 29 at 3669-71.  The trial court specifically

20   instructed the jury that it could consider "the existence [sic] or non-existence of a bias,

[1]    That instruction provides as follows:

The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating this testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard this testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in this case.

CALJIC 3.20.  Section 1127a of the California Penal Code, which requires that this instruction be given at the request of a party, was not signed into law until September 25, 1989, about five months after the jury returned the capital verdict against Petitioner.  1989 Cal. Legis. Serv. 901 (West).

United States District Court

For the Northern District of California

1    interest or other motive" as well as "the witness' prior conviction of a felony," State Rec. 29

2    at 3670, instructions which the jury would have understood to apply to Szymkiewicz.

3        Second, defense counsel cross-examined Szymkiewicz, bringing out not only the

4    reduced sentence he hoped to receive in exchange for his testimony, but also the lack of

5    clarity of his memory, to challenge the reliability of his testimony.  State Rec. 29 at 2863-74.

6        Finally, much of Szymkiewicz' testimony was corroborated by Petitioner's

7    handwritten notes, and by both Ms. Kitchell and her sister, Ms. Stracener, who testified at

8    trial that Petitioner threatened them to dissuade them from testifying.  As Szymkiewicz'

9    testimony was corroborated by documentary evidence and testimony, the absence of a

10   cautionary instruction on jailhouse informant testimony was not prejudicial.  See United

11   States v. Bosch, 914 F.2d 1239, 1247 (9th Cir.1990).

12       In the context of the entire record, the trial court's failure to instruct the jury to view

13   the informant testimony with caution did not deprive Petitioner of a fair trial in violation of

14   his right to due process.  Estelle, 502 U.S. at 72.  Nor was trial counsel ineffective for failing

15   to request such an instruction, as Petitioner contends, in light of the corroborating evidence at

16   trial and the instructions given by the Court.  Accordingly, the Court grants Respondent's

17   motion for summary judgment on Claim Fourteen.

18       **D.    Juror Bias**

19       In Claim Fifteen Petitioner contends that the presence of a biased juror, Wood,

20   violated his right to an impartial jury under the Sixth Amendment.  Am. Opp. at 31.  This

21   claim challenges both the trial court's failure to strike Juror Wood for cause, and defense

22   counsel's failure to exercise a peremptory challenge to remove him.  The California Supreme

23   Court denied the trial court error claim on direct appeal, holding that any such error was

24   harmless because Petitioner did not exhaust his peremptory challenges.  Fairbank, 16 Cal. 4th

25   at 1238.  This Court has previously denied a motion to dismiss the claim for procedural

26   default, merging the procedural issue with the substantive issue of whether Petitioner is able

27   to establish the ineffective assistance elements of the claim.  See March 22, 2005 Order.

28

1    Petitioner contends that Juror Wood was biased because he conceded that his past
2    experience as a trial witness to the shooting of a friend left him disillusioned about the
3    criminal justice system; he believed that a guilty man had been set free.  Am. Opp. at 32-33.
4    As evidence of Wood's bias, Petitioner cites the voir dire transcript, where Wood conceded
5    that "I'm not going to railroad anybody.  I'm bitter over the past.  That's all."  State Rec. 29
6    at 1059.  Petitioner argues that Wood's receptivity to penalty phase arguments was
7    compromised by his belief that the defense lawyers twisted the truth in the prior case where
8    he testified.  Am. Opp. at 33.  Contrary to Petitioner's characterization of Wood's statements
9    as unequivocally indicating that he could not fairly judge the evidence, however, Wood
10   acknowledged that he would not have doubts or be skeptical as to what Petitioner's defense
11   counsel would show at trial because he understood that this was "a totally separate affair."
12   State Rec. 29 at 1068.

13        Outside the prospective jurors' presence, defense counsel challenged Wood for cause,
14   arguing that Wood's experience as a trial witness permeated his viewpoint about the judicial
15   system and that he did not understand how murder could be divided into different degrees
16   with different penalties.  State Rec. 29 at 989, 1070.  The prosecutor pointed out that Wood
17   indicated that "if he had a reasonable doubt as to any of the special allegations or charges that
18   he would follow the law."  State Rec. 29 at 1059, 1075.  Furthermore, the record indicates
19   that defense counsel successfully argued against the prosecutor's challenge to another
20   veniremember, Parker, who indicated that he "would not be satisfied with beyond a
21   reasonable doubt" as to circumstantial evidence.  Defense counsel pointed out that Parker
22   stated that he would put aside his personal views and follow the instructions of the court, as
23   the prosecutor argued that Juror Wood would do.  State Rec. 29 at 1076.  The trial court
24   subsequently denied the parties' respective challenges to Wood and Parker.  Id.

25        The last reasoned state court decision on the issue of Juror Wood's bias is the trial
26   court's ruling on Petitioner's motion for new trial, based in part on this ground.  In ruling that
27   the juror challenges for cause were properly denied, the trial court noted that "in addition to
28   listening to the mere words of the jurors, which is difficult to read a transcript and get the full

United States District Court

For the Northern District of California

1    flavor, I think, of what went on in selecting a jury, I also, of course, had the opportunity to

2    view the jurors as they spoke and watched their body language and get a little better idea of

3    what they were telling us and whether it was true and what their true feelings were."  State

4    Rec. 29 at 4005.

5         The trial court's determination of juror fitness is accorded special deference.  <u>Patton v.

6    Yount</u>, 467 U.S. 1025, 1036-40 (1984).  Federal habeas relief may be granted for a state trial

7    court's failure to strike a juror for cause only when there is no fair support in the record for

8    the trial court's determination that the juror was unbiased.  <u>See</u> <u>Wainwright v. Witt</u>, 469 U.S.

9    412, 424 (1985).  The state court's determination of juror partiality is entitled to a

10   presumption of correctness on federal habeas review.  <u>Id.</u> at 429.  The Supreme Court has

11   reasoned recently that reviewing courts owe deference to the trial court's decision to excuse a

12   juror because "it is in a position to assess the demeanor of the venire, and of the individuals

13   who compose it, a factor of critical importance in assessing the attitude and qualifications of

14   potential jurors."  <u>Uttecht v. Brown</u>, 127 S.Ct. 2218, 2224 (2007); <u>see</u> <u>also</u> <u>United States v.</u>

15   <u>Alexander</u>, 48 F.3d 1477, 1484 (9th Cir. 1995) (determination of impartiality is particularly

16   within province of trial judge).

17        Petitioner seeks an evidentiary hearing on Juror Wood's alleged bias concerning the

18   inability to separate varying degrees of murder with varying degrees of culpability.  Am.

19   Opp. at 34.  Because the claim of juror bias can be resolved by reference to the state court

20   record, Petitioner's request for an evidentiary hearing is denied.  Juror Wood fully disclosed

21   any basis for the alleged bias during voir dire and was rehabilitated upon further questioning

22   by both the prosecutor and defense counsel, who elicited Juror Wood's remarks that someone

23   could be guilty of murder but should not get a death sentence.  <u>See</u> State Rec. 29 at 1893-

24   1902 (Wood's individualized voir dire).  Petitioner had an opportunity to show bias at voir

25   dire, and had a further opportunity to present the claim of juror bias on his motion for new

26   trial.  Petitioner's claim therefore does not present a situation requiring a post-trial hearing on

27   juror bias, such as where a prejudicial event or extraneous communication during the trial

28   influenced a juror without defense counsel's knowledge.  <u>Cf.</u> <u>Smith v. Phillips</u>, 455 U.S. 209,

215-18 (1982) (prosecutors did not disclose the known fact that a juror submitted a job application to the district attorney's office during trial); <u>Remmer v. United States</u>, 347 U.S. 227, 229 (1954) (defense counsel unaware that F.B.I. investigated an attempted bribe on a juror during trial); <u>Wisehart v. Davis</u>, 408 F.3d 321, 326-27 (7th Cir. 2005) (juror learned that defendant had taken polygraph test). Nor does Petitioner allege that Juror Wood deliberately withheld information on voir dire. <u>Cf.</u> <u>Williams v. Taylor</u>, 529 U.S. at 440-42 (juror did not disclose that she was divorced from a deputy sheriff who testified at trial and that a prosecutor had represented her in the divorce proceedings). In light of Juror Wood's statements to the Court during voir dire, the arguments of trial counsel, and the trial court's ruling on Petitioner's challenge for cause and his motion for new trial, Petitioner fails to rebut by clear and convincing evidence the presumption of correctness owed to the trial court's determination that Juror Wood was not biased. 28 U.S.C. § 2254(e)(1).

As to Petitioner's claim that trial counsel "inexplicably failed to later use one of his four remaining peremptory challenges against Juror Wood," and were therefore incompetent, Petitioner argued on direct appeal and in the present habeas petition that trial counsel's decision not to exhaust peremptory challenges was reasonable:

> [a]t the point defense counsel passed for cause, there were two jurors on the panel whom Petitioner had previously challenged (Foster and Wood). In the venire pool, remained two persons who had been subject to unsuccessful defense challenges for cause at both the general and <u>Hovey</u> sessions (Metzger and Lopez), and one person who had been challenged unsuccessfully during the <u>Hovey</u> voir dire (Matoso). Counsel had been compelled to use peremptories against two clearly impartial jurors who had survived challenge (Lintt and Brandi), and had only four peremptories left. If counsel exhausted all of their allotted peremptories, there was a clear possibility of having empaneled at least one juror, and possibly two, who had been challenged at both sessions. Indeed, it was the trial court's erroneous refusal to excuse unqualified jurors which placed defense counsel in an impermissible and untenable double bind, forcing them to choose between accepting a panel with jurors they had challenged or excusing those jurors and accepting jurors [who] were at least, and arguably more, partial to the prosecution's case.

Am. Pet., ¶ 653. As defense counsel's jury selection strategy has been demonstrated by Petitioner to be reasonable under the circumstances, there is no genuine issue of fact as to the

United States District Court

For the Northern District of California

1   claim of ineffective assistance.  Accordingly, Respondent's motion for summary judgment on

2   Claim Fifteen is granted.

3           **E.       Crime Scene and Autopsy Photographs**

4           Petitioner contends in Claim Sixteen that the trial court erred in the guilt and penalty

5   phases by admitting allegedly gruesome photographs of Wendy Cheek's body as it appeared

6   when discovered and during the autopsy.  The state supreme court denied this claim on the

7   merits without a reasoned opinion.  State Rec. 46.

8           During the guilt phase, the trial court admitted Exhibits 3-B through 3-E, showing Ms.

9   Cheek's body as it was found lying in brush and debris; and Exhibit 9, an autopsy

10  photograph showing a close-up of her charred hand wearing a ring which was later used to

11  identify the victim.  State Rec. 29 at 2729-2733, 2771.  The prosecution introduced these

12  photographs prior to Petitioner's guilty plea, when Petitioner's guilt was still at issue.

13          During the penalty phase, the trial court admitted Exhibits 15-A, 15-C and 15-D over

14  trial counsel's objection that the autopsy photographs were duplicative, gruesome and

15  prejudicial, but excluded 15-B, which depicted the victim's face.  State Rec. 29 at 2856.  The

16  trial court also admitted Exhibit 16, a photograph of the fatal stabbing wounds, over similar

17  objections.  State Rec. 29 at 2857.  Of the 17-Series, the trial court excluded Exhibits 17-A

18  and 17-B, showing wounds on the back of the victim's neck before the body was cleaned, but

19  admitted 17-C, 17-D and 17-E over defense counsel's objection.  State Rec. 29 at 2856-2857.

20  The trial court also admitted Exhibit 18, over defense counsel's submitted objection, which

21  was a Polaroid photograph depicting the actual size of the wounds to the back of the head

22  and neck which the pathologist found to be unusual.  State Rec. 29 at 2899, 2935.  Proffered

23  through the state's pathologist during the penalty phase, these photographs depicted the

24  injuries suffered by the victim and suggested that the bruising near the sternum occurred

25  about twenty minutes to an hour before the other wounds, including various stab

26   wounds.  The prosecution introduced these photographs as aggravating evidence under

27  factor (a), which allows the jury to consider the circumstances of the murder.  State Rec. 29

28  at 2901-02; 2929-2935.  <u>See</u> Cal. Penal Code § 190.3(a).

1    Petitioner's guilty plea precludes federal habeas relief on any claim alleging pre-plea

2    violations in the guilt phase.  See Tollett v. Henderson, 411 U.S. 258, 267 (1973).  To the

3    extent that Petitioner is challenging the admission of photographs after he pleaded guilty,

4    Petitioner has failed to identify any constitutional guarantee violated by the admission of the

5    photographs or explain how their admission denied him a fundamentally fair trial guaranteed

6    by due process.  See Estelle, 502 U.S. at 67-68.

7    A review of the record reveals that the state court's denial of this claim was not

8    objectively unreasonable.  Summary judgment on Claim Sixteen is granted.

9    **VI.   Diminished Capacity**

10    In Claim Seventeen, Petitioner argues that he was incapable of forming the requisite

11    intent for first degree murder because he suffered from organic brain damage, depression,

12    attention deficit disorder, post-traumatic stress disorder, alcoholism, drug addiction, and

13    substance abuse.  Am. Pet., ¶¶ 703-11.  Petitioner further claims that all prior counsel failed

14    to raise this basis for relief.  Am. Pet., ¶¶ 712-13.  The state supreme court denied this claim

15    on the merits.  State Rec. 46.  Respondent previously moved to dismiss this claim as barred

16    by the guilty plea.  In its March 22, 2005 Order the Court denied the motion to dismiss on the

17    ground that the claim is merged into petitioner's ineffective assistance of counsel claim.

18    As the Court has previously discussed, Petitioner has submitted a declaration by his

19    habeas expert, Dr. Stalcup, asserting that Petitioner was in a state of toxic psychosis at the

20    time he committed the capital crime.  See Am. Pet., Ex. 273, ¶¶ 106-107.  Petitioner contends

21    that this expert declaration creates a disputed issue of material fact as to whether his conduct

22    conformed to the requirements of first degree murder, rendering summary judgment

23    inappropriate without further discovery and an evidentiary hearing.

24    The Court has concluded, however, that counsel's advice to plead guilty

25    notwithstanding the evidence of Petitioner's substance abuse was not ineffective assistance

26    of counsel.  See supra at 26-27.  Moreover, even if counsel should have presented to the jury

27    the evidence now marshaled by Petitioner, Petitioner has not and cannot demonstrate a

28    reasonable probability that this evidence of his mental illnesses would have affected the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   outcome of the trial.  See Hoffman v. Arave, 455 F.3d 926 (9th Cir. 2006), judgment vacated

2   in part on other grounds, Arave v. Hoffman, 128 S.Ct. 749 (2008).

3          Under California law, evidence of mental disease, defect or disorder is admissible

4   "solely on the issue of whether or not the accused actually formed a required specific intent,

5   premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is

6   charged."  Cal. Penal Code § 28(a).  California does not recognize a defense of diminished

7   capacity.  Id. § 28(b).  Moreover, a defendant's expert shall not testify as to whether the

8   defendant had the required mental state; instead, the question shall be decided by the trier of

9   fact.  Cal. Penal Code § 29.

10         Based on the Court's independent review of the record, the Court concludes that it is

11  not reasonably probable Petitioner's evidence would have negated the required intent.  The

12  evidence of Petitioner's consciousness of guilt notwithstanding his substance abuse and the

13  other ailments alleged by Petitioner is staggering: the considerable efforts he made on the

14  night of the murder to conceal his crime, including disposing of evidence, and moving and

15  burning the body; the letters to Szymkiewicz months later recounting details of the crime;

16  and his subsequent threats to the witnesses against him.

17         The Court's conclusion is supported by the Ninth Circuit's decision in Hoffman.  In

18  Hoffman, the court concluded that defense counsel was ineffective by failing to investigate a

19  possible mental state defense to a charge of first degree murder.  The court nonetheless held

20  that there was not a reasonable probability that the evidence of the defendant's mental

21  capacity would negate the required specific intent.  455 F.3d at 936.  The court noted that the

22  defendant had the mental capacity to complete several intentional acts the night of the

23  murder, including driving around and changing a flat tire on a car.  He also had the

24  wherewithal to destroy evidence of the murder: he burned his clothes, cleaned his car, and

25  cut up the weapon.  Id.  The defendant also bragged about his crime to others.  The court

26  summarized:

27         The fact that he had the cognitive ability to recognize that he should cover up
           evidence of Williams's murder, that he was able to perform functions such as
28         driving and changing a tire, and that he was involved in Simonis's kidnaping

1
2
3
4

> during the same period indicate that Hoffman probably had sufficient capacity to know what he was doing and what the end result of his conduct would be. We do not believe there is a "reasonable probability" that a jury would have found otherwise. Accordingly, we conclude that Hoffman was not prejudiced by his counsels' deficient performance in failing to investigate and present a diminished capacity defense.

United States District Court
For the Northern District of California

Id. at 937.  The same result obtains here: the fact that Petitioner had the cognitive ability to recognize that he should cover up the murder, and that he was able to perform such functions as getting the body into his car without being seen, driving to a neighboring county, buying gasoline, burning the body, and hiding other evidence, and then, month later, being able to recount details of the crime and threaten witnesses against him, show that notwithstanding his expert's testimony, he had "sufficient capacity to know what he was doing and what the end result of his conduct would be." Id.  There is no reasonable probability that a mental state defense would have succeeded.

As Petitioner's allegations would not establish a right to relief, his request for an evidentiary hearing is denied. See Totten v. Merkle, 137 F.3d at 1176 (affirming denial of evidentiary hearing on mental-state defense based on drug-induced paranoia where ample evidence in the record demonstrated defendant's planning and deliberate actions). Respondent's motion for summary judgment is therefore granted as to Claim Seventeen.

**VII.   Competency to Be Executed**

In Claim Eighteen, Petitioner contends that he is incompetent to be executed pursuant to Ford v. Wainwright, 477 U.S. 399 (1986).  Petitioner acknowledges that this claim is not ripe because there is no established date for execution, and preserves this claim for review. Am. Pet., ¶ 720.  He presented this claim as the sixteenth claim in his state exhaustion petition, which the state supreme court denied as premature under state law.  State Rec. 46 (citing People v. Kelly, 1 Cal. 4th 495, 545 n.11 (1992)).  Respondent notes that once an execution date is set, the state has statutory procedures for determining whether an inmate is competent to be executed.  Mot. at 47 n.40 (citing Cal. Penal Code § 3700 et seq.).  As Petitioner's Ford claim is premature at this time, Respondent's motion for summary

71

1   judgment is granted as to Claim Eighteen without prejudice.  See Stewart v. Martinez-

2   Villareal, 523 U.S. 637, 644-646 (1998).

3   **VIII.   Meaningful Appellate Review**

4        Petitioner argues in Claim Nineteen that he was denied fair consideration of his

5   automatic appeal to the California Supreme Court, suggesting that the cursory treatment of

6   his claims denied him due process and meaningful appellate review.  Petitioner contends that

7   the California Supreme Court has defaulted its appellate review responsibilities in capital

8   cases, citing the rise in that court's affirmance rate from 71.8% for the period from 1987 to

9   1989, to 94.2% for the period from 1990 to 1992.  Am. Pet., ¶ 733.  The state supreme court

10  denied this claim on the merits.  State Rec. 46.

11       Respondent argues that this claim is not cognizable as a federal habeas claim because

12  this court has no authority to "look behind" a state court decision or consider the manner in

13  which a state court conducts its post-trial review.  See Kilgore v. Bowersox, 124 F.3d 985,

14  996 (8th Cir. 1997).  Meaningful appellate review in a capital case is crucial to protect

15  against arbitrary or irrational imposition of the death penalty in violation of the Eighth

16  Amendment, and requires the appellate court to ensure that a death sentence was based on

17  individualized consideration of the defendant's circumstances, his background, and his crime.

18  See Parker v. Dugger, 498 U.S. 308, 321 (1991); Clemons v. Mississippi, 494 U.S. 738,

19  748-50 (1990).  This Court is limited to granting habeas relief only where the state court's

20  adjudication of a claim resulted in a "decision that was contrary to, or involved an

21  unreasonable application of, clearly established Federal law, as determined by the Supreme

22  Court of the United States; [or] resulted in a decision that was based on an unreasonable

23  determination of the facts in light of the evidence presented in the State court proceeding."

24  28 U.S.C. § 2254(d).  Thus, the Court may consider whether the state supreme court properly

25  denied specific claims raised in the individual petition, but not Petitioner's challenge to the

26  state court's "internal decision making" procedures for reviewing capital sentences, nor his

27  objection to the California Supreme Court's affirmance rate of capital sentences.  See Am.

28  Pet., ¶¶ 728-739.

72

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Petitioner has failed to submit evidence that the California Supreme Court denied him

2    individualized consideration on direct review.  To the contrary, the record indicates that the

3    state supreme court issued a carefully reasoned opinion affirming Petitioner's conviction and

4    capital sentence.  See Fairbank, 16 Cal. 4th 1223.  Therefore, the Court finds that there are no

5    triable issues of material fact regarding this claim challenging the state supreme court's

6    appellate review process.  A review of the record reveals that the state court denial of this

7    claim was not objectively unreasonable.  Respondent's motion for summary judgment is

8    granted as to Claim Nineteen.

9    **IX.    Challenge to Lethal Injection**

10    In Claim Twenty, Petitioner challenges the administration of lethal injection in

11    California as cruel and unusual punishment in violation of the Fifth, Sixth, Eighth and

12    Fourteenth Amendments.  To the extent that this claim contests the constitutionality of lethal

13    injection, it is foreclosed by the Supreme Court's ruling in Baze v. Rees, No. 07-5439, 2008

14    WL 1733259 (2008) (lethal injection is not prohibited by the Constitution).  To the extent

15    that petitioner challenges California's protocol as outlined in San Quentin Operational

16    Procedure No. 770, this claim is moot because this protocol is no longer in use.  See Morales

17    v. Tilton, 465 F. Supp. 2d 972 (N.D. Cal. 2006).

18    Summary judgment on Claim Twenty is granted without prejudice.  Petitioner may

19    reassert his challenge to California's protocol by raising a claim pursuant to 42 U.S.C.

20    § 1983.

21    **XI.    Constitutional Challenge to California's Death Penalty Statutes**

22    In Claim Twenty-One, Petitioner contends that California's death penalty is

23    unconstitutional.  This claim consists of ten subclaims.  Each shall be addressed in turn.

24    In Subclaims One and Two, Petitioner challenges the death penalty as inherently cruel

25    and unusual and not fairly imposed.  The Supreme Court has held, however, that the death

26    penalty "does not invariably violate the Constitution."  Gregg v. Georgia, 428 U.S. 153, 169

27    (1976).  The California Supreme Court likewise rejected this challenge on direct appeal,

28    holding that "the death penalty is not cruel and unusual punishment in violation of the Eighth

Amendment to the federal Constitution." <u>Fairbank</u>, 16 Cal. 4th at 1255.  The state court's ruling was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

In Subclaim Three, Petitioner alleges that California's statutory scheme fails to adequately narrow the class of death-eligible murderers.  The Ninth Circuit has rejected this claim.  <u>See</u> <u>Karis v. Calderon</u>, 283 F.3d 1117, 1141 n. 11 (9th Cir. 2002) (California statute satisfies narrowing requirement set forth in <u>Zant v. Stephens</u>, 103 S. Ct. 2733 (1983)); <u>Mayfield v. Woodford</u>, 270 F.3d 915, 924 (9th Cir. 2001) (declining to grant COA on claim that California's death penalty statute does not adequately narrow the class of persons eligible for the death penalty).  Addressing petitioner's claim on direct appeal, the California Supreme Court found that "California's homicide and death penalty laws sufficiently narrow the class of homicide offenders eligible for the death penalty to satisfy the federal Constitution . . . ." <u>Fairbank</u>, 16 Cal. 4th at 1255.  The state court's ruling was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

In Subclaim Four, petitioner alleges that California's definition of first degree murder is unconstitutionally vague and overbroad.  Because Petitioner pleaded guilty to first degree murder, he has waived this claim.

In Subclaim Five, Petitioner alleges that the number of special circumstances outlined in Cal. Penal Code § 190.2 renders every murder a potential capital crime and thus fails to narrow the class of death-eligible cases.  As noted above, the Ninth Circuit has ruled to the contrary.  <u>See</u> <u>Karis</u>, 283 F.3d at 1141 n. 11 ("The special circumstances in California apply to a subclass of defendants convicted of murder and are not unconstitutionally vague").  The California Supreme Court also rejected this claim on direct appeal.  <u>Fairbank</u>, 16 Cal. 4th at 1255. The state court's ruling was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

In Subclaim Six, Petitioner contends that California Penal Code section 190.3(a) identifying the circumstances of the crime as an aggravating factor is unduly vague and

1    overbroad.  The Supreme Court has upheld the constitutionality of that statutory provision.

2    <u>Tuilaepa v. California</u>, 512 U.S. 967, 976 (1994).  Petitioner's allegations lack merit.

3        In Subclaim Seven, Petitioner alleges that California's statutory death determination

4    scheme in its entirety is unconstitutional.  Petitioner reiterates arguments contained in the

5    preceding subclaims.  For the above-mentioned reasons, petitioner's allegations lack merit.

6        In Subclaim Eight, Petitioner challenges the state's method of execution by lethal gas

7    pursuant to California Penal Code § 3604.  That statute provides that a capital prisoner shall

8    be executed by either lethal gas or lethal injection.  Cal. Penal Code § 3604(a).  If a prisoner

9    fails to choose either method, the penalty of death shall be imposed by lethal injection.  Cal.

10   Penal Code § 3604(b).  Because Petitioner will be executed by lethal injection unless he

11   chooses lethal gas, he lacks standing to challenge the constitutionality of execution by lethal

12   gas.  <u>See</u> <u>Stewart v. LaGrand</u>, 526 U.S. 115, 119 (1999).

13       In Subclaim Nine, Petitioner alleges that the death penalty statute fails to designate

14   which factors are mitigating or aggravating, fails to require a unanimous finding of death

15   beyond a reasonable doubt, and fails to require written findings.  The Ninth Circuit has

16   rejected these challenges.  <u>See</u> <u>Williams v. Calderon</u>, 52 F.3d at 1484-85.  The California

17   Supreme Court also rejected these allegations on direct appeal.   <u>Fairbank</u>, 16 Cal. 4th at

18   1255-56.  The state court's ruling was not contrary to, and did not involve an unreasonable

19   application of, clearly established federal law.

20       Finally, Petitioner's contention in Subclaim Ten that his death sentence was

21   disproportionate to the crime does not raise a ground for habeas relief, as proportionality

22   review is not required by the Constitution.  <u>Pulley v. Harris</u>, 465 U.S. 37, 45-48 (1984).

23       For the above-mentioned reasons, Respondent's motion for summary judgment on

24   Claim Twenty-One is granted.

25   **XI.   Cumulative Error**

26       In Claim Twenty-Two, Petitioner contends that multiple errors in his pre-trial, trial,

27   appeal and post-conviction challenges had cumulative prejudicial impact.  The state supreme

28   court denied this claim on the merits.  State Rec. 46.

United States District Court

For the Northern District of California

1    Having reviewed the record and the papers, the Court has found no prejudicial error in

2    Petitioner's individual claims.  Even if considered cumulatively, the alleged errors are not

3    sufficiently prejudicial to overcome the overwhelming evidence of guilt.  See Allen v

4    Woodford, 395 F.3d 979, 1019 (9th Cir. 2005).  Thus, Respondent's motion for summary

5    judgment is granted on the claim of cumulative error.

6                                        **CONCLUSION**

7    At oral argument Petitioner urged the Court to follow the procedure set forth in its

8    case management order of June 23, 2005 (Docket No. 125).  In that Order the Court directed

9    the parties to file cross motions for summary judgment on record-based claims that they

10   believe can be resolved as a matter of law.  The Court indicated that after it ruled on the cross

11   motions for summary judgment it would proceed to adjudicate cross motions on disputed-fact

12   claims, followed by motions for discovery, followed by petitioner's motion for an evidentiary

13   hearing.  Respondent subsequently moved for summary judgment on all claims on the ground

14   that all can be resolved on the record; Petitioner contends that none can be so resolved.

15   As this Memorandum and Order demonstrates, the Court agrees with Respondent.

16   The record in this case is unusually complete.  The state trial court held numerous hearings,

17   including evidentiary hearings, both before and after trial.  During those proceedings the state

18   court founds various facts, such as facts related to Petitioner's guilty plea.  The transcripts

19   also reveal trial counsel's strategy.  Counsel's closing argument, as well, aptly demonstrates

20   defense counsel's tactics.  Under AEDPA there is simply no basis for permitting discovery

21   and holding an evidentiary hearing.  The record before the Court demonstrates that the state

22   court's rejection of Petitioner's claims was neither contrary to, nor an unreasonable

23   application of, clearly established federal law and thus must be upheld.

24   Respondent's motion for summary judgment is granted as to Claims One through

25   Seventeen, Nineteen, Twenty-One, and Twenty-Two.  The petition for writ of habeas corpus

26   is denied as to those claims.

27   Respondent's motion for summary judgment is granted without prejudice as to Claim

28   Eighteen as premature.

United States District Court
For the Northern District of California

1      Respondent's motion is granted as to Claim Twenty without prejudice to Petitioner

2  raising a claim pursuant to 42 U.S.C. § 1983.

3      **IT IS SO ORDERED.**

4

5  DATED: July 22, 2008                                    
                                          _____
6                                         CHARLES  R. BREYER
                                          UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

Copies of Order mailed on July 22, 2008 to:

Mark R. Drozdowski, Esq.

Office of the Federal Public Defender

321 East Second Street

Los Angeles, CA  90012-4202

Nanette Winaker

Office of the Attorney General

455 Golden Gate Avenue, Suite 11000

San Francisco, CA  94102-7004

Habeas Corpus Resource Center

303 Second Street, Suite 400 South

San Francisco, CA  94107

Federal Court Docketing

California Appellate Project

101 Second Street, Suite 600

San Francisco, CA  94105